Nodell Motors, Inc. v. Commissioner.
Nodell Motors, Inc. v. Commissioner
Docket No. 309-66.
United States Tax Court
T.C. Memo 1967-209; 1967 Tax Ct. Memo LEXIS 53; 26 T.C.M. (CCH) 1027; T.C.M. (RIA) 67209; October 25, 1967
Jackson L. Boughner, 39 S. LaSalle St., Chicago, Ill., for the petitioner. Nelson E. Shafer, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income taxes for the calendar years 1962 and 1963 in the amounts of $254.15 and $514.56, respectively. In its petition, petitioner claimed overpayments in the amounts of $7,086.34 and $6,688.81 for the calendar years 1962 and 1963, respectively. The sole issue for decision in this case is whether petitioner was availed of during the years here in issue for the purpose of avoiding income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed so as to be subject *55 to the accumulated earnings tax imposed by section 531, I.R.C. 1954. [1]
Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is a corporation with its principal office at the date the petition in this case was filed in Illinois. [2]
Petitioner filed its Federal income tax returns for the calendar years 1962 and 1963 with the district director of internal revenue, Chicago, Illinois. Petitioner was incorporated in 1946 and initially engaged in the business of selling De Soto and Plymouth automobiles in Oak Park, Illinois. In 1954 it *56 acquired the Ford franchise under which it sold Ford automobiles in Oak Park, Illinois until the surrender of its Ford franchise in July 1955. From the time of its incorporation throughout the years here in issue and up through the time of the trial of this case Harold A. Nodell (hereinafter referred to as Nodell) was president of petitioner. Nodell started in the automobile business shortly after he graduated from college in the 1920's. In 1936 he commenced operating a Plymouth and De Soto automobile business in Oak Park, Illinois, which he incorporated in 1946 as petitioner corporation. About 1946 Nodell began making efforts to obtain a Cadillac franchise and in this connection he contacted either a representative of General Motors Corporation (hereinafter referred to as General Motors) in Detroit or at the General Motors branch office in Chicago, Illinois about once a year. In 1953 Nodell filed a written application with General Motors for a Cadillac franchise at "Oak Park or similar location." This application was filed in the office of General Motors in Detroit in its file of applicants for franchise at "no definite location." As a result of this application and subsequent *57 discussions between Nodell and representatives of General Motors, Nodell acquired a Cadillac dealership franchise in Milwaukee during the year 1955. The Cadillac Motor Car Division of General Motors has in its files no written application from Nodell for a Cadillac dealership franchise made at any time during or prior to the year 1963 other than his application filed in 1953. On May 19, 1955, Nodell Cadillac, Inc., was incorporated to operate a Cadillac automobile dealership in Milwaukee, Wisconsin. At the time of its incorporation Nodell Cadillac, Inc., borrowed $400,000 from petitioner and executed promissory notes therefor. When Nodell received the Cadillac franchise in Milwaukee, General Motors required as a condition of awarding him this franchise, that petitioner surrender its Ford franchise in Oak Park, Illinois. Under Nodell's agreement with the Cadillac Motor Car Division of General Motors with respect to the Milwaukee dealership, Nodell is designated as the dealership "operator" and his son, Reid F. Nodell, is designated as the "nominee" for Nodell Cadillac, Inc.
When the Cadillac Motor Car Division of General Motors grants a franchise to an operator, in some instances *58 it will enter into an interim agreement addendum whereby the operator designates a "nominee" to continue the dealership business in the event of the operator's death or incapacity. If the nominee is qualified and approved by the Cadillac Motor Car Division, he is offered a 2-year "probationary" dealership agreement upon the operator's death or incapacity. If the nominee's performance is satisfactory during the 2-year period, he may be offered a regular dealer's selling agreement. The operations of the Nodell Cadillac, Inc., in Milwaukee, Wisconsin have been successful, and this corporation had surplus and undivided profits of $337,722.68, $390,113.89, and $432,325.98 as of December 31, 1961, 1962, and 1963, respectively. In 1961 it repaid $100,000 of the $400,000 it had borrowed from petitioner when it commenced operation in 1955 and in 1963 repaid petitioner the balance of the amount it had borrowed. When petitioner was required to relinquish its Ford franchise, it made a sale of its Ford dealership business and rented the real estate at 711 West Madison Street, Oak Park, Illinois in which the Ford dealership business was being operated to the purchaser of its Ford dealership *59 business. There were certain fixtures in the building which petitioner leased to the purchaser of its Ford business which are necessary in operating a new car sales dealership [and] which are of a nature that removal is difficult. These fixtures such as hoists, bins, and lifts, are generally installed and owned by the lessee of property leased for operating an automobile dealership. Petitioner sold the fixtures of this type which were in its building at 711 West Madison Street in Oak Park to the purchaser of its Ford dealership to whom it rented its building in Oak Park. The following schedule shows petitioner's assets and liabilities as of December 31, 1961 and 1962: December 31, 1961
December 31, 1962
Assets
Amount
Total
Amount
Total
Cash
$ 167,612.54
$ 76,477.68
Notes and accounts receivable
316,488.37
314,417.06
Prepaid Insurance
951.00
1,763.22
Corporate Stocks
64,475.00
178,030.00
Buildings and other fixed depreciable
assets
$408,340.01
$420,809.01
Less: Accumulated amortization and
depreciation
117,561.00
290,779.01
126,921.33
293,887.68
Land (net of any amortization)
223,523.71
211,004.71
Insurance Reserve
77,510.82
93,707.35
Total assets
$1,141,340.45
$1,169,287.70
Liabilities and Capital
Accounts payable
125.00
125.00
Taxes
21,358.11
21,358.11
Federal income tax
15,203.03
16,457.57
Common stock
40,000.00
40,000.00
40,000.00
40,000.00
Earned surplus and undivided profits
1,064,654.31
1,091,347.02
Total liabilities and capital
$1,141,340.45
$1,169,287.70
*60 At all times pertinent to this case, petitioner had the following property: (a) Improved real estate at 711 West Madison Street, Oak Park, Illinois, and at 666 West Madison Street, Oak Park, Illinois, both of which properties have been leased to third parties since 1955, and unimproved real estate at 7300 West Madison Street, Forest Park, Illinois, which has been leased on a month-to-month basis. The property at 711 West Madison Street was leased to the operator of a Ford dealership from the time petitioner sold its Ford dealership business until July 1, 1965, when petitioner leased it to General Motors to be used in a company branch Cadillac operation. (b) A farm located approximately 30 miles southwest of Chicago, Illinois, which was acquired in 1956 at an approximate cost of $102,000 and which has been leased to third parties for $3,000 per year. The depreciation schedule as attached to petitioner's 1962 income tax return contained the following information: Depreciation
1962
Date
Reserve
Depre-
Acquired
Cost
12/31/61
Method
Rate
ciation
Building - 711 Madison
1949
$357,319.29
$ 89,925.31
SL
50 Yr.
$7,146.38
Sidewalks & Drives
1949
5,105.50
2,569.78
SL
25 Yr.
204.22
Parking Lots (Black Top)
1949
6,460.00
6,460.00
SL
10 Yr.
Parking Lot Fence
1949
2,463.90
2,463.90
SL
10 Yr.
Building - 666 Madison
1951
30,000.00
9,900.00
SL
33 1/3 Yr.
900.00
Forest Park Fence
1952
2,128.00
2,046.80
SL
10 Yr.
81.20
Improvements
1953
3,720.18
3,348.96
SL
10 Yr.
371.22
Improvements
1959
1,043.14
846.25
DB
10 Yr.
39.38
Furniture & Fixtures
1949
100.00
(Salvage Value)
Farm Brick Building
8,000.00
SL
25 Yr.
320.00
Farm Frame Barn
3,500.00
SL
15 Yr.
233.33
Farm Sheds
969.00
SL
15 Yr.
64.60
$420,809.01
$117,561.00
$9,360.33
*61 The similar schedule attached to petitioner's 1961 income tax return listed the same properties with the exception of the last three items of farm buildings. The 1961 income tax return on the first two items, Building - 711 Madison, and Sidewalks and Drives, showed depreciation reserve as of the year ended December 31, 1960 of $82,778.93 and $2,365.56, respectively, and 1961 depreciation in the same amount as 1962 depreciation. Petitioner's investments in corporate stocks as shown on its balance sheets as of December 31, 1961 and December 31, 1962 were investments in listed stocks in unrelated corporations, and the parties agree for the purpose of this case that the fair market value of these investments is substantially the same as the cost thereof as shown in these balance sheets. On March 1, 1963, Nodell Investment Company was incorporated with its principal place of business at Milwaukee, Wisconsin, and at approximately the time of its incorporation Nodell Cadillac, Inc., sold all of its real estate to Nodell Investment Company at the book value of the real estate and transferred to the Nodell Investment Company its outstanding note payable to Nodell Motors, Inc. The notes *62 and accounts receivable as shown on the balance sheets of petitioner's tax returns for the years 1960 through 1963 include the following outstanding loans: 1960
1961
1962
1963
Nodell Cadillac, Inc.
$400,000
$400,000
$300,000
Nodell Investment Co.
$250,000
Waters
120,000 Waters was a solvent individual and the loan made to him could have been repaid at any time. The loan made by petitioner to Waters had no relation to any automobile business or activity. At all times pertinent to this case, the stock in petitioner, Nodell Cadillac, Inc., and Nodell Investment Company was issued and held as follows: Nodell
Nodell
Nodell
Relationship to
Motors,
Cadillac,
Investment
Name
Harold A. Nodell
Inc.
Inc.
Company
Harold A. Nodell
119
128
3
Reid F. Nodell
Son
81
118
99
Nancy E. Nodell
Daughter
81
2
198
Florence E. Nodell
Wife
119
2
During the years involved in this case and from the time of the sale by petitioner of its Ford dealership in 1955, petitioner's income had consisted of rents, interest on loans, dividends, and capital gains. Its deductions have consisted primarily of *63 real estate taxes, depreciation, insurance and a management fee of 10 percent of net rentals which was paid to Nodell. Other than the management fee paid to Nodell, petitioner paid no salaries or wages and had no employees. Petitioner on its 1962 and 1963 Federal income tax returns stated its principal business activity to be "Operator of Real Estate." During the years 1955 through 1956 and up until June 1, 1967 there were in the Chicago, Illinois, metropolitan area 14 Cadillac motor car sales outlets operating as dealerships and 6 such outlets which were company operated branches of the Cadillac Motor Car Division of General Motors. All 6 of the company operated branches had been in existence and so operated since 1919. As of December 31, 1963, one of these branches on Michigan Avenue in Chicago was discontinued. Five of the dealership outlets had been in constant existence since the 1920's, with the only changes in ownership since the original formation of the dealerships resulting from the death of the originally franchised operator and the taking over of the operation by the nominee under the Interim Agreement Addendum or by a successor. One of the dealerships in the Chicago *64 area had been commenced in 1935 and there had been no change in the dealership since that date. One of the 14 dealerships was established in 1945 and two in 1948 and there had been no change in ownership since the dates of establishment in two of these dealerships. One of the dealerships established in 1948 was sold in January 1967. One of the dealerships, established October 1, 1949, was terminated when the operator sold out and retired and was reassigned as of September 1, 1955 to another operator who operated it thereafter. Of the 14 dealerships one was originally set up in 1952, one in 1953, and one in 1964, and there had been no changes in the operators of these dealerships since they were set up except that a co-owner of the dealerships established in 1952 withdrew in 1964 and opened a new dealership outside the Chicago area. As of January 3, 1966, a dealership in Highland Park was formed as a result of the selling of a company branch operation which had been commenced in 1935 to a private individual. The only new dealership created in the period 1955 up to June 1, 1967 was the one at Oak Lawn created in 1964. Since obtaining the Milwaukee Cadillac dealership in 1955, Nodell *65 has from time to time spoken to various officials of the Cadillac Motor Car Division of General Motors both at Detroit and in Chicago with respect to obtaining a Cadillac dealership in Oak Park. Under General Motors policy, two Cadillac franchises could not be issued to Nodell. It has been Nodell's intention, if he were to obtain a Cadillac dealership in Oak Park, to sell his Milwaukee Cadillac operation and operate an Oak Park dealership through petitioner. At no time from 1955 through the time of the trial of this case has the Oak Park area been one that would justify the existence of more than one Cadillac outlet. No representative of General Motors has at any time indicated to Nodell that the branch operation at Oak Park would ever be sold. The general manager of the Chicago area Cadillac branches, which area includes Oak Park, advised Nodell, when Nodell discussed with him the possibility of obtaining a Cadillac dealership in Oak Park that to the best of his knowledge the Oak Park branch was not for sale and that he had no knowledge of any plans to dispose of the Oak Park branch. During the time between World War II and 1963, the Cadillac Motor Car Division of General Motors *66 had up to 19 existing branch operations, and during this period only one of these operations was sold and this sale occurred in 1947. Since World War II, four Cadillac Motor Car Division branch operations have been purchased. These four were purchased in 1949, two in Los Angeles and two in San Francisco. The distributors at these locations decided for reasons of health to sell out and Cadillac Motor Car Division purchased the dealerships to operate as branches. Subsequent to 1962, there have been five sales of Cadillac branch operations in addition to the one in Highland Park to which reference was heretofore made to operator-dealers. Two of these branches that were sold to dealerships were in Detroit, two in San Francisco, and one in Los Angeles. Throughout the country in some years no Cadillac dealerships change hands or become available, but in some years more than five operations may become available. On the average throughout the country there would be two or three Cadillac dealerships available per year. The Cadillac Motor Car Division of General Motors receives many applications for dealerships and in selecting an operator for a large dealership considers between 15 and *67 20 applicants for such dealership before selecting one. The primary concern of the officials of the Cadillac Motor Car Division of General Motors in selecting an operator when a Cadillac dealership becomes available is the personal qualifications of the individual to whom the dealership is to be granted. Also, the financial ability of the individual is considered. The minimum working capital which would be required by General Motors for a person being granted a franchise as a Cadillac dealer depends upon the size of the dealership. The Cadillac factory branch outlet in Oak Park, Illinois experienced an unusually large sales volume in 1962, selling approximately 640 units in that year. If the factory branch in Oak Park were to be sold to an operator as a dealership, the working capital requirement of such a dealership would in the first instance be computed on averages for large exclusive Cadillac dealerships throughout the country. Based on the Cadillac sales by the Oak Park dealership during 1962, the minimum net working capital standard as of that year was approximately $356,950. At the time of this trial in 1967 the current planning potential for the location of the Cadillac branch *68 operation in Oak Park was 690 units of sales per year. The 1967 minimum working capital standard based on such a potential is approximately $442,000. The net working capital standard as computed by General Motors, encompasses cash, parts, accessories, and tubes, as well as the automobiles, but excludes buildings and installed fixed equipment such as bins, hoists and lifts. A Cadillac dealership would not be granted to an operator unless he had either available or plans to obtain an adequate building in which to operate. The operator would also have to acquire the necessary equipment for the operation such as bins, hoists and lifts. At the time petitioner rented its building at 711 West Madison Street in Oak Park to General Motors for the Oak Park Cadillac branch operation, the lessee purchased the installed fixed equipment such as bins, hoists, and lifts from the former tenant of the building who as heretofore stated had purchased this equipment from petitioner. The lease between petitioner and General Motors Company (Cadillac Division) was for a 5-year term expiring June 30, 1970 with the right of the lessee to renew for two additional 5-year periods and was at a rental of $44,400 *69 a year. This lease contained among other provisions the following: That all machinery, movable partitions, fixtures, floor covering or equipment installed in the demised premises at the Lessee's expense shall remain the property of the Lessee and may be removed by the Lessee. The Lessee shall, however, repair any damage caused directly and exclusively by said removal. If the premises were vacated by the lessee and equipment owned by the lessee and installed in the building such as bins, hoists, and lifts were not removed or sold to the person to occupy the building thereafter, such equipment would revert to petitioner. In the operation of Nodell Cadillac, Inc., in Milwaukee, WisconsinNodell did not "floor plan" his cars. In figuring the minimum required standard of working capital for a Cadillac dealer of a certain size required by General Motors, the amount is determined on the basis that the cars would be "floor planned", that is, that the cars would not be paid for by the dealer until they were sold and that the dealer would pay interest on the purchase price of the cars to General Motors between the time the cars were invoiced to the dealer and the time they were sold to *70 customers of the dealer and payment made to General Motors. A dealer who paid for instead of floor planning his cars would require somewhat more working capital for the operation of his dealership than would a dealer who floor planned his cars. General Motors would not necessarily require a new dealer to have the minimum standard net working capital but would want such a new dealer to have at least 85 percent of such amount. It was not imperative that the entire amount be furnished by the dealer to whom the franchise was issued, and it would be permissible even that some portion be borrowed. Nodell and the business manager of Nodell Cadillac, Inc., of Milwaukee both estimated that as of June 1967, based on an operation in Oak Park selling 650 cars a year but operating the business as business was operated by Nodell Cadillac, Inc., in Milwaukee, Wisconsin, the required working capital for the operation would be between $600,000 and $700,000. The business manager of Nodell Cadillac, Inc., estimated that as of 1962 and 1963 the required amount for such an operation would be about 5 percent less than the estimated $600,000 to $700,000. This estimate was based on an estimate of approximately *71 $418,000 being needed during the period from July 1966 through June 1967 by Nodell Cadillac, Inc., in Milwaukee, Wisconsin, for sales of approximately 314 cars per year. No dividends were paid to any of petitioner's stockholders during any of the years 1955 through 1963. The stockholders of petitioner would have incurred additional income tax liabilities in each of the years here in issue if petitioner had declared and paid dividends in each of these years. Respondent on May 24, 1965, mailed to petitioner a letter stated to be in accordance with the provisions of section 534 informing petitioner that it was proposed to issue a statutory notice of deficiency for the years 1962 and 1963 setting forth an amount with respect to section 531, relating to the accumulated earnings tax and advising petitioner that within 60 days it might submit a statement of the grounds on which it relied to establish that all or any part of the earnings and profits had not been allowed to accumulate beyond the reasonable needs of the business. On July 8, 1965, petitioner submitted to respondent a statement in substance setting forth that Nodell and petitioner had been steadily requesting a Cadillac *72 franchise in Oak Park from General Motors and that petitioner had rented its properties in Oak Park and retained its funds in order that when a Cadillac agency was made available to it in Oak Park, it would have the necessary required capital to satisfy the requirements of General Motors and to conduct the business satisfactorily. Respondent in his notice of deficiency determined that for the years 1962 and 1963 petitioner had net taxable income of $42,226.09 and $39,214.49, respectively, and had accumulated taxable income as defined in section 535 of $26,692.71 and $26,194.09, respectively for these years which was subject to the accumulated earnings tax imposed by section 531 with the explanation that petitioner was "formed or availed of for the purpose of avoiding the income tax of your shareholders by permitting earnings and profits to accumulate instead of being divided or distributed." Ultimate Facts 1. Petitioner during the years 1962 and 1963 engaged in no activities except holding property and collecting income therefrom, lending money, investing in property and selling stocks and securities, and is therefore a holding or investment company within the meaning of section *73 533(b). 2. Petitioner as of the beginning of each of the calendar years 1962 and 1963 had accumulated earnings and profits in excess of any reasonable or reasonably anticipated needs of its business, and during each of these years it accumulated its earnings and profits beyond any reasonable or reasonably anticipated needs of its business. Opinion It is respondent's position that petitioner was a mere holding or investment company within the meaning of section 533(b) [3] and that under the provisions of that section this fact is prima facie evidence of the purpose to avoid the income tax with respect to its shareholders. The facts here show that since petitioner's sale of its Ford dealership in 1955 throughout the years here involved, and to the date of the trial of this case, petitioner's activities consisted entirely of holding property and collecting income therefrom, buying and selling stocks and *74 securities, making a few loans and investing in new property. Under section 1.533-1(c) [4], Income Tax Regulations, which we cited with approval in Rhombar Co., 47 T.C. 75, 91 (1966), on appeal (C.A. 2, Mar. 17, 1967), a corporation having only the activities which petitioner here had is a mere holding or investment company. In answer to respondent's argument, petitioner does not specifically argue that its activities do not cause it to fall within the definition of a mere *75 holding or investment company within the meaning of section 533(b) but contends that that section merely sets up a rule of evidence which may be rebutted by other evidence. Petitioner contends that the evidence introduced at the trial of this case shows that the purpose to avoid the income tax with respect to its shareholders was not the reason for petitioner's accumulation of its earnings and profits but rather that the reason was to have sufficient funds to operate a Cadillac franchise which it reasonably anticipated obtaining. Petitioner argues that evidence that its earnings and profits were not accumulated beyond the reasonable needs of its business is sufficient to rebut the prima facie evidence as provided by section 533(b) that petitioner's purpose in its accumulation was to avoid the income tax with respect to its shareholders. We have held that the fact that a corporation makes a showing that its earnings and profits have not been permitted to accumulate beyond the reasonable needs of its business does not relieve that corporate taxpayer from the ultimate burden of showing that it was not availed of for the purpose of avoiding the income tax with respect to its shareholders *76 by permitting earnings and profits to accumulate instead of being divided. Pelton Steel Casting Co., 28 T.C. 153, 183 (1957), affd. 251 F. 2d 278 (C.A. 7, 1958). All the evidence in this case, other than that dealing with the nature of the income and activities of petitioner, was directed toward whether petitioner's earnings and profits in the years here in issue were permitted to accumulate beyond the reasonable needs or reasonably anticipated needs of its business. It is respondent's position that the prima facie evidence provided for in section 533(b) as to the ultimate question in the case, namely, whether the purpose of petitioner's accumulation of earnings in the years here in issue was to avoid the income tax with respect to its shareholder would not be overcome by a showing of the accumulation not being in excess of the reasonably anticipated needs of petitioner's business even if petitioner had made such a showing which respondent contends it has not. It is unnecessary for us to resolve the issue here on the basis of the prima facie evidence resulting from the fact that petitioner during the years here in issue was a mere holding or investment *77 company within the meaning of section 533(b). The evidence here establishes that petitioner had no reasonable anticipation of obtaining a Cadillac franchise in Oak Park, Illinois during the years here in issue or in the reasonably foreseeable future and also that as of the beginning of each of the years here in issue petitioner's already accumulated earnings and profits were ample to finance operations under such a franchise if one were obtained. When this case was called for trial, petitioner filed a Motion for Order on Burden of Proof, reciting that "the notification called for by Section 534(b) has not been sent to the Petitioner and that the Petitioner submitted the statement described in subsection 534(c) of the grounds (together with facts sufficient to show the basis thereof) on which the Petitioner relies to establish that all of the earnings and profits were not permitted to accumulate beyond the reasonable needs of the business during the years involved." After argument of the parties, the Court ruled that the letter sent by respondent was in compliance with section 534(b) and that petitioner's statement did not contain sufficient facts to comply with the requirements *78 of section 534(c) and that therefore the burden of proof was upon petitioner. The question of burden of proof is no longer of importance in this case since the evidence adduced at the trial affirmatively showed that petitioner's earnings and profits were permitted to accumulate beyond the reasonable needs or reasonably anticipated needs of its business. The evidence with respect to the casual discussions between Nodell and various representatives of the Cadillac Motor Car Division of General Motors showed that at no time was Nodell promised either a present Cadillac dealership in Oak Park or that at any reasonably foreseeable future date would such a Cadillac dealership be available to him. The evidence shows that the Cadillac dealership in Oak Park had been operated as a company branch since 1919 and that Nodell had been informed that there was no intention to dispose of it as a company branch. The evidence shows that in 1965 petitioner rented its building to the branch operation of the Cadillac Motor Car Division in Oak Park for a 5-year term with option to renew for two additional terms of 5 years. Nodell attempted to explain this by stating that he thought if General Motors decided *79 to sell the Cadillac dealership in Oak Park, he would have a better chance of obtaining it if the current operations were being conducted in petitioner's building. However, the fact that the lease was for a 5-year term with options to renew for two additional such terms indicates to us that even as of 1965, 2 years after the last year here involved, all indications were that the branch operation in Oak Park would not be sold by General Motors at any time in the near future. This evidence merely corroborates other evidence in the record that petitioner had no reasonable basis for anticipating that a Cadillac dealership in Oak Park would be available to it at any time in the reasonably foreseeable future as of the years here involved. The testimony of the representatives of General Motors with whom Nodell had discussed the obtaining of a dealership in Oak Park shows that they held out no hope to him that such a dealership would be available at any reasonably foreseeable future date. The evidence likewise shows that even if there were a reasonable basis for petitioner to anticipate that a Cadillac dealership would be available to it in the reasonably foreseeable future, its accumulated *80 earnings as of the beginning of each of the years here in issue were sufficient to finance such a dealership. The evidence shows, and petitioner so recognizes and requests a finding to that effect, that the minimum working capital standard of General Motors for the Cadillac operation at Oak Park, Illinois, based on national averages, was $356,950 in 1962 and $442,000 in 1967. Petitioner makes no contention that what it refers to as its "owned net working capital" was less than these amounts, but argues that petitioner would have been operated by its president, Nodell, and that Nodell would have operated at Oak Park as he operated in Milwaukee by paying for instead of floor planning cars and that therefore as petitioner would have been operated, the operation would, as of 1967, have required between $600,000 and $700,000 and approximately 5 percent less or between $570,000 and $665,000 as of 1962. It is petitioner's argument that it did not have as of the beginning or end of the years 1962 and 1963 "owned net working capital" in these amounts. Petitioner arrives at this conclusion by using as its net assets as of December 31, 1962 and 1963, $1,131,346.52 and $1,148,826.72, respectively. *81 From this it subtracts the assets shown on its balance sheet of prepaid insurance and insurance reserve in the amounts of $95,470.57 and $101,193.92 as of December 31, 1962 and 1963, respectively, and amounts denominated "land and building" of $402,510.27 and $395,228.22, making the total amounts deducted from net assets $497,980.84 and $496,422.14, after which it arrives at working capital of $633,365.68 and $652,404.58 as of December 31, 1962 and December 31, 1963, respectively. Petitioner then subtracts from these amounts $100,000 which it designates as "equipment." The facts here do not show what the amounts of $95,470.57 and $101,193.92 represent or why in arriving at working capital these items should be subtracted. If these amounts alone are added back to the figures used by petitioner, the result would be amounts in excess of even petitioner's estimate of the working capital needed. It also appears that petitioner has included in the land and building items subtracted some land and buildings that were not part of the property it had leased to the Ford dealership and later to the General Motors branch for the operation of an automobile dealership. We have set forth in our *82 findings of fact the building items listed on petitioner's depreciation schedule contained in its 1962 income tax return and without going into a detailed discussion of the figures, it is apparent that petitioner has taken out of its assets more than just the land and building at 711 West Madison Street which was the building it leased for the operation of an automobile dealership. How petitioner arrived at the value of the land which it deducted is not shown by the evidence. Apparently all that was subtracted from its total cost of land was the cost of the farm which petitioner owned and not the value or cost of the land located at 666 West Madison Street, Oak Park, Illinois or the unimproved real estate at 7300 West Madison Street, Forest Park, Illinois. Also, petitioner has not shown that it would be necessary for it to acquire equipment at a cost of $100,000. The only evidence in this regard in the record is Nodell's testimony that to replace the equipment which petitioner had sold to the Ford dealership in 1935 when it rented the building at 711 West Madison Street to that dealership and which equipment had subsequently been sold to the branch operation of Cadillac would be *83 at the "approximate cost" of at least $100,000. There is no showing in the record what cost petitioner would sustain if it purchased the equipment such as bins, hoists, lifts, and other similar equipment from the dealership it succeeded in the building as had been done by the Ford dealership and the Cadillac branch operation. The evidence indicates that the accumulated earnings as of the beginning of each of the years here in issue minus merely the undepreciated cost of the building at 711 West Madison Street and the land on which it was located would leave enough earnings and profits as of the beginning of each year for working capital for a Cadillac dealership in Oak Park operated as Nodell estimated he would operate it using approximately the working capital requirement he estimated. This amount is greatly in excess of the minimum working capital standards required by General Motors and it is questionable whether the reasonable needs of the operation of a Cadillac operation in Oak Park, Illinois, should be considered to be in excess of the minimum required standard set by General Motors. On the basis of the evidence in this case we conclude that petitioner's earnings and profits *84 were permitted to accumulate beyond the reasonable needs of its business including reasonably anticipated needs of the business. Under section 533(a) this fact is "determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." There is no evidence in this case to the contrary of a purpose to avoid the income tax with respect to petitioner's shareholders. In fact the other evidence such as no dividends having been declared by the company since 1955, loans being made to businesses unrelated to any automotive type of business, and investments being made in such items as farm land and stocks, all indicate that the purpose of permitting the accumulation of earnings and profits was to avoid income tax to the shareholders. Petitioner cites several cases, some of them dealing with corporations actively engaged in the operation of automobile dealerships, in which we have held that the accumulation of earnings was for the reasonable needs of the corporate business. None of the cases cited by petitioner involved a corporation which was not currently in the active operation of the business *85 for which it contended the accumulation was needed. Also the facts in the instant case with respect to the corporate business needs differ greatly from the facts in this respect in the cases relied upon by petitioner. Since the determination to be made in cases involving the accumulated earnings tax under section 531 is basically factual, no useful purpose would be served by discussing in detail and distinguishing the various cases relied upon by petitioner. Decision will be entered for respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. In the petition it is alleged that petitioner's principal office is in Milwaukee, Wisconsin, and this allegation is admitted in respondent's answer. However, the parties have stipulated that, "During each of the years in question (1962 and 1963), and when the petition herein was filed, petitioner's principal office was in Illinois; * * *" We therefore assume that the failure to correct the pleadings was either an oversight or that the parties assume the stipulation was in effect a correction of the pleadings.↩
3. SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. * * *
(b) Holding or Investment Company. - The fact that any corporation is a mere holding or investment company shall be prima facie evidence of the purpose to avoid the income tax with respect to shareholders.↩
4. Sec. 1.533-1(c), Income Tax Regs.
(c) Holding or investment company. A corporation having practically no activities except holding property and collecting the income therefrom or investing therein shall be considered a holding company within the meaning of section 533(b). If the activities further include, or consist substantially of, buying and selling stocks, securities, real estate, or other investment property (whether upon an outright or marginal basis) so that the income is derived not only from the investment yield but also from profits upon market fluctuations, the corporation shall be considered an investment company within the meaning of section 533(b).↩