**PELTON STEEL CASTING CO.,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent.

No. 12107.

United States Court of Appeals
Seventh Circuit.

Jan. 7, 1958.

---

Malcolm K. Whyte, Richard L. Greene, John L. Palmer, Robert V. Abendroth, Milwaukee, Wis. Whyte, Hirschboeck, Minahan, Harding & Harland, Milwaukee, Wis., of counsel, for petitioner.

Charles K. Rice, Asst. Atty. Gen., Elmer J. Kelsey, Lee A. Jackson, Robert N. Anderson, Attorneys, Department of Justice, Washington, D. C., for respondent.

Before FINNEGAN, SCHNACKENBERG and PARKINSON, Circuit Judges.

FINNEGAN, Circuit Judge.

Section 102(a) of the Internal Revenue Code of 1939, as amended, 55 Stat. 687, 26 U.S.C. § 102 (1952 ed.) imposed a surtax on corporations improperly accumulating surplus. The respondent Commissioner decided that Pelton Steel Casting Co., petitioner, was availed of in 1946 for the purpose of preventing the imposition of such surtax upon its shareholders by accumulating the corporate earnings and profits instead of dividing or distributing them. That determination of the Commissioner covered fiscal years ending November 30, 1945 and November 30, 1946; penalty tax for 1945 was $12,214.22 and for 1946, $69,746.66. The Commissioner conceded there was no deficiency for the year 1945. We have before us for review the Tax Court's lengthy opinion, reported as Pelton Steel Casting Co. v. Commissioner of Internal Revenue, 1957, 28 T.C. 153, approving the 1946 penalty tax, and resting in considerable part on stipulated facts. Detailing of the operative facts is obviated by their presentation in the opinion issued by the Tax Court, and for that reason we merely describe the factual situation.

During its fiscal year 1946 Pelton had earnings and profits of $209,731.58 and its common stock was held, in these proportions, by: Ehne—60%, Fawick—20% and, Slichter—20%. When Ehne and Fawick informed Slichter of their mutual desire to sell Pelton, Slichter decided to avert an outside sale. After Slichter consulted a banker and lawyer the three stockholders agreed on November 11, 1946, that the corporation would buy up and redeem 80% of the common stock held by Ehne and Fawick at their price of $1,200,000 (this being 80% of $1,500,000, the selling price of the Pelton assets when offered to outsiders). Under the plan Ehne and Fawick were to receive $800,000 in cash and $400,000 in Pelton preferred stock. That cash flowed from two sources: (1) $300,000 was Pelton's own money and, (2) $500,000 was borrowed by Pelton on a 10-year agreement, dated April 17, 1947, under which an insurance company covered $300,000 to mature in the last six years, and Pelton's bank covered $200,000 to mature during the first four years. This loan, secured by a mortgage on Pelton's plant, was made May 31, 1947, the date when Slichter became the sole common stockholder as the result of the sale-redemption arrangement of 80% of the outstanding common stock held by Ehne and Fawick. Ehne's preferred stock, newly issued to him under the above plan, was immediately purchased by Slichter who gave Ehne a 20-year installment note.

Financiers planning Pelton's purchase of the common stock advised against declaration and payment of dividends during 1946. Again, to repeat for emphasis, it is the Tax Court's opinion which contains recitals of pertinent facts and reproduces the relevant financial statements. On the other hand, this record clearly establishes Pelton as a closely

held corporation whose three director-stockholders did not receive 1946 dividends.

An interesting sidelight here comes from the Tax Court opinion:

"The respective amounts of the personal income tax actually paid by A. J. Ehne for 1946 and the estimated amount of tax for which he would have been liable had all of the 1946 earnings and profits (209,731.58) been distributed in the form of a dividend in that year and had his 60 per cent thereof (some $126,-000) in addition to his other income for that year ($47,063.93, per his tax return) been taxed to him at ordinary income rates, are as follows:

| Actual | Estimated | Estimated difference |
| --- | --- | --- |
| $22,786.73 | $124,955.96 | $102,169.23 |

"The tax paid by A. J. Ehne in 1947 on the $603,571 gain realized under the plan on the retirement of his interest in petitioner under the elective alternative tax rates in effect was approximately $150,-000. * * *"

The inference, of course, is that instead of dividing all or a portion of the 1946 earnings and profits, totaling $209,-731.58, Ehne, Fawick and Slichter countenanced that accumulation and then plowed these earnings into redemption of the common stock. Such an inference is within respectable bounds of reasoning on the evidence before us. On the other hand, Pelton strives to cancel out that inference, and indeed any violation of § 102, by pressing on us, as it did the Tax Court, Slichter's undiminished efforts to preserve Pelton's independent existence. In short, the evidence shows that Slichter envisaged Ehne and Fawick selling Pelton to a corporate cannibal; consequently, complete control through the reorganization plan, already described, of Pelton by Slichter loomed up as the only salvation. That reorganization was rejected by the Tax Court on the grounds that it was not promoted for a valid business purpose.

Clearly the batch of ideas sponsored on Pelton's behalf fails in hurdling this passage in § 102, as amended: "There shall be levied, collected and paid for each taxable year * * * upon the net income of every corporation * * * if such corporation * * * is * * * *availed* of for the *purpose of preventing* the imposition of the surtax upon its shareholders * * * *through the medium of permitting earnings or profits to accumulate* instead of being divided or distributed * * *." Obviously, the fact an accumulation existed, in Pelton's case, is uncontroverted, and its appeal simply urges that the accumulation was not the type or class penalized by § 102.

Regardless of how Pelton's propositions raised in this appeal are analyzed they recur to the basic theme of "reasonable business needs." But what Chief Judge Magruder wrote for the court about Helvering v. Chicago Stock Yards Co., 1943, 318 U.S. 693, 63 S.Ct. 843, 87 L.Ed. 1086 in the course of the opinion[1] reported as Latchis Theatres of Keene v. Commissioner, 1 Cir., 1954, 214 F.2d 834, 835 is both incisive and relevant here. "* * * when the record contained substantial evidence to support the ultimate inference by the Board of Tax Appeals that corporate profits had been accumulated for the forbidden purpose, the reviewing court had better not disturb the decision of the Board of Tax Appeals (now the Tax Court of the United States); it had better forego any finicky refinements in an examination of the subsidiary steps, the mental processes, by which the Board of Tax Appeals arrived at its ultimate finding of fact. Since then, by the 1948 amendment to § 1141(a) of the Internal Revenue Code, 62 Stat. 991 [26 U.S.C.A. § 1141(a)], the scope of our review of findings of the Tax Court has been made the same as our review of findings of the district courts in civil actions tried with-

1. McCutchin Drilling Co. v. Commissioner, 5 Cir., 1944, 143 F.2d 480; Trico Products Corp. v. McGowan, 2 Cir., 1948, 169 F.2d 343.

out a jury; that is, the Tax Court's findings of fact cannot be set aside 'unless clearly erroneous'."

Dill Manufacturing Co. v. Commissioner, 1939, 39 BTA 1023 and Gazette Publishing Co. v. Self, D.C.Ark.1952, 103 F.Supp. 779 are the two main props erected by Pelton's counsel when contending that the reorganization plan was a valid business purpose outside the ambit of § 102. But reliance on those two cases is misplaced by overlooking the fact that the Pelton plan required, and had, unanimous stockholder approval. The actuality of the consummated plan could only be reached, and was achieved, by the favorable vote of Ehne, alone, or in combination with Fawick. Both Dill and Gazette are instances where the majority of shareholders bought out a minority, and to that extent Pelton, Dill and Gazette are all cases where the majority (at bar Ehne, Fawick and Slichter) of stockholders acted, but only in Pelton did a minority stockholder remain in the corporation, after the majority sold out and all three men enjoy the tax benefit of the planned action. Congress, when it was considering provisions corresponding to § 102 in the Bill that culminated in the Internal Revenue Code of 1954, pointed up the difficulties implicit in delineating proscribed accumulations:

> "One of the principal reasons for confusion as to application of the section 102 tax has been the lack of adequate standards as to what constitutes the reasonable needs of the business. Some of the standards informally employed in the past, such as the distribution of 70 per cent of earnings, have been erroneous or irrelevant. More often, in the absence of adequate guidance, revenue agents in examining cases have applied their individual concepts as to business needs.
>
> "As a result some improper criteria developed which have led to criticism of the tax on unreasonable accumulations. One such principle is the so-called immediacy test, under which there must be an immediate need for the funds in order to justify the retention of earnings. In some cases section 102 was applied even though the corporation had definite plans for expansion and the *bona fides* of the expansion program were not in question.
>
> "In order to eliminate the immediacy test, both the House and your committee have expressly provided in the statute that the reasonable needs of the business shall include the 'reasonably anticipated' needs of the business. It is contemplated that this amendment will cover the case where the taxpayer has specific and definite plans for acquisition of buildings or equipment for use in the business. It would not apply where the future plans are vague and indefinite, or where execution of the plans is postponed indefinitely." Sen.Rep. No. 1622, 83d Cong. 2d Sess. 69 (1954).

Slichter's testimony in the Tax Court demonstrates that Ehne, especially, and Fawick wanted to sell Pelton. Representing 80% of the outstanding capital, as these two men did, they could have ended the independent existence of Pelton. All Slichter's action and motivation[2] indicates is a vague sort of

---

2. See e. g. 28 T.C. at page 167: "Slichter, who had made petitioner his life's work—developing close personal contacts with its customers and becoming largely responsible (especially after Leekley's withdrawal) for employee relations—was very concerned that petitioner might become a 'capitive foundry' (viz., controlled by a large steel company, toward the filling of whose sole requirements its operation would then become devoted). He was also concerned about the attendant changes in the nature of its business (viz., the loss, in effect, of its corporate personality) as well as the possibly deleterious effects on employee relations and the status of 'key men' in the organization as it existed. Slichter did not like the idea of petitioner's becoming a subsidiary of some out-of-town corporation and of having his employee policies interfered with."

moral obligation toward faithful employees and some understandable pride in perpetuating Pelton as a separate entity. Ransoming Pelton was apparently far from the evidenced state of mind attributable to Ehne or Fawick.

Section 102, containing as it did penalty provisions, was intended as a deterrent. Its aim was to prevent the corporation from being used as a device for avoiding surtax on individual incomes. The singular feature, frequently and conveniently overlooked, is that the penalty tax may be avoided by distributing earnings. See e. g. Carey, Accumulations Beyond The Reasonable Needs Of The Business: The Dilemma Of Section 102(c), 60 Harv.L.Rev. 1282 (1947). The record is utterly devoid of countervailing evidence either palliating or eradicating the situation interdicted by § 102, indeed we are satisfied Pelton was "availed of" during the taxable year.

The judgment of the Tax Court is

Affirmed