OPINION. Murdock, Judge: No contention is made that the petitioner is a mere holding or investment company. The Commissioner has not determined that the petitioner was organized for the purpose of stockholder tax saving or that the earnings or profits of the petitioner for any taxable year were permitted to accumulate beyond the reasonable needs of its business. He says in his brief, “The reasonableness or unreasonableness of an accumulation of earnings is but one factor in determining intent and although in many instances it may be the most important factor to be considered, such is not the case here.” The only question presented for decision is whether, as to each taxable year, the petitioner was availed of for the purpose of preventing the imposition of the surtax upon its sole stockholder through the medium of permitting earnings to accumulate instead of being divided or distributed. Cf. Young Motor Co., 32 T.C. 1336. The respondent’s contention, as stated at the beginning of his original brief, is as follows: The respondent contends that the land acquisitions were investments and not related to petitioner’s business, that even if the land acquisitions were related the petitioner could have paid dividends, and, therefore that the corporation was availed of for the proscribed purpose which renders the petitioner liable for the Section 102 surtax or Section 531 accumulated earnings tax for the years 1950, 1952, 1953 and 1954. The land acquisitions to which he refers are: “In 1951 petitioner’s excess funds went into a motel which was sold in 1955. In 1953 its excess funds were put into a 345-acre ranch three miles south of Eeno.” These were actual acquisitions, not mere reserves for planned future acquisitions. There were no land acquisitions during 1950. The investment of approximately $100,000 in liquor near the close of 1950 was obviously a justifiable use of the earnings of that year directly connected with the operation of the business of the petitioner. The record also indicates that the purchase of the Eoaring Camp collection and the use of it both inside and outside of the club was a proper expenditure for advertising purposes as was the employment of Stagg and his wife to advertise Harolds Club and the collection throughout Nevada and neighboring States. Harolds Club paid the petitioner $19,000 a year for 10 years beginning in 1950 for the use of items of the Eoaring Camp collection and to reimburse the petitioner for its payments to the Staggs under the employment contract. The connection between Harolds Club and the petitioner is so close that the use of this material and the outside advertising, all in the name of Harolds Club, also benefits the petitioner in proportion to the benefits received by Harolds Club. The displays of the Eoaring Camp material within the club were mostly around or on the petitioner’s bars. The evidence shows that the option to buy Harold’s stock and the possible need of funds to exercise the option were also closely connected with, the business of the petitioner. The evidence as a whole shows that the retention of the 1950 earnings was not for the purpose of preventing the imposition of the surtax upon its sole stockholder. The obligations to the Staggs and the possibility of having to exercise the stock option existed throughout 1952. The petitioner on the last day of 1951 purchased the Moana Auto Apartments and about $79,000 of the purchase price was represented by a mortgage reduced during 1952 to $69,879.69. This transaction was closely connected and directly related to the business of the petitioner which in turn was closely tied in with the business of Harolds Club. It enabled the petitioner on behalf of itself and Harolds Club to provide at least some of their patrons with lodging accommodations at reasonable rates and the petitioner with profit and other advantages. Justifiable changes were made to the interior of the Motel during 1952. An adjacent coffee shop was purchased in September 1953 for about $25,000. The further expansion, originally planned, was never carried out because the asking price for the adjoining land became discouragingly high. The whole property was sold at a profit in 1955 for reasons adequately explained in the Findings of Fact. The evidence as a whole fairly preponderates in favor of the holding that the 1952 earnings of the petitioner were not retained for the purpose of preventing the imposition of the surtax upon its sole stockholder. Meanwhile the accumulation of earnings was increasing. The petitioner began in December 1953 to purchase a substantial quantity of extremely high-priced land within a few miles of Beno. The explanation for these purchases given in the petitioner’s briefs, based upon the testimony of Lent and Smith, is that the land was needed to protect Harolds Club in case rival gambling operations should try to develop successful strip operations in the environs of Beno. It does not appear that any rival ever bought any nearby land and established a strip operation or that this supposed danger was imminent, but the witnesses knew of attempts being made by rivals to purchase land along one or more of the motor routes leading into Beno. Harolds Club had no intention of abandoning its operations in downtown Beno, in any event. The petitioner actually bought land in December 1953 for which it paid or became obligated to pay over $870,000, and in 1954 acquired additional land at $110,-096.80, making the total amount which it paid or became obligated to pay for this purpose almost $1,000,000. About 348 contiguous acres were purchased. The purchase of this land at such a large price for the stated purpose by Harolds Club might be one thing, but by the petitioner is quite another. The plan, as stated by tlie witnesses, was that the petitioner would furnish the land and Harolds Club would make the improvements at its own expense. Actually, the first tangible evidence of any planned improvement of the land was some architect’s drawings furnished in 1957, together with an estimate of $17,000,000 cost for the pictured improvements. No improvements of any kind have been placed on the property. The land has been used only for leasing to farmers since its purchase by the petitioner and annual net losses of from $5,000 to $6,000 have been sustained in that connection. It is hard to believe from the record as a whole that Harolds Club had any intention of improving this land unless the threat of outside competition developed into reality. The obvious question is- — why should the petitioner acquire this acreage at a cost of almost a million dollars and how could that acquisition justify the failure of the petitioner to pay dividends in 1953 and in 1954. The petitioner had no intention, at least none appears, of using this land to carry on a separate business. Cf. Eegs. 118, sec. 39.102-3 (b), and Income Tax Eegs., sec. 1.537-3 (T.D. 6377, 1959-1 C.B. 125). The large amount of liquor purchased in 1950 was used in the, business of the petitioner. The Eoaring Camp collection was used throughout the taxable years to decorate and to attract people to the bars of the petitioner and was used in other ways to advertise Harolds Club and thus to attract additional patrons to the club and customers to the bar. The Moana Motel was used to house patrons of the club and substantial gross income was derived from this source. A justifiable use of earnings for those purposes explained the failure to pay a dividend. But no such explanation stems from the purchase of the farmland in 1953 and 1954. The petitioner would have had ample funds with which to pay substantial dividends to its sole stockholder in 1953 and 1954, had it not used so much of its funds in those years to purchase these farmlands. There is no adequate indication in the record of how the petitioner was ever to justify, through its bar business, the purchase of these farmlands, i.e., how it was to get a proper return on such a large investment. The plan was, as stated by the witnesses, that the petitioner was to contribute these lands to a joint undertaking in which Harolds Club was to build and pay for the improvements. The only benefit to the petitioner stated was that it could operate the bars appropriate to the improvements. Houses were planned around a golf course. It might be assumed that the petitioner would receive payment for the land to be sold with such houses. Additional bars would give the petitioner additional opportunity to make profits, but any profits to the petitioner which may be imagined would be long deferred and a doubtful return on such a large investment. Accumulations could continue in later years if suck purchases are sufficient justification. Other possible business purposes of the petitioner in buying this land are not too obvious. The Commissioner contends that it was bought purely as an investment for ultimate sale at a profit, because such land was scarce and prices were rising. This may be so, but the evidence is that the petitioner was sustaining net losses of $5,000 or $6,000 a year from its rental of this land. In other words, the land was not carrying itself. The petitioner, of course, has the ultimate burden of proof. Pelton Steel Casting Co., 28 T.C. 153, affd. 251 F. 2d 278 (C.A. 7), certiorari denied 356 U.S. 958. Neither witness was asked directly by counsel for either party whether or not he, as a director, considered the tax consequences to Smith in reaching his decision against the payment of a dividend. Smith’s taxable income during each of the taxable years was large and placed him in high tax brackets. He owned and controlled the petitioner. The petitioner paid no dividends and paid Smith no salary. Income-producing property was assigned to the petitioner corporation by Smith. The retention by the petitioner of its earnings would save Smith from additional surtaxes which he would have had to pay if the petitioner had distributed dividends to him. Cf. Young Motor Co., supra. The strong circumstantial evidence in this case supports the Commissioner’s determination that earnings for the years 1953 and 1951 were accumulated by the petitioner rather than distributed for the purpose of preventing the imposition of the surtax on its sole stockholder. Cf. R. L. Blaffer & Co., 37 B.T.A. 851, affd. 103 F. 2d 487 (C.A. 5), certiorari denied 308 U.S. 576. The evidence as a whole not only does not show that the Commissioner’s determination on this issue as to 1953 and 1954 was incorrect but, on the contrary, tends to show that it was correct, at least that a purpose to avoid imposition of the surtax on Smith was not absent in 1953 and 1954. The petitioner has claimed a credit for 1954 under section 535 (c) (1) of the Internal Revenue Code of 1954. The Commissioner in his brief ignores this contention and the taxpayer, assuming that it will be sustained on the first issue, merely says that it is entitled to the full amount of its accumulations at the end of 1954 as a credit under this provision. Thus the Court is without any help from the parties on this issue, which apparently requires decision. The accumulations at the end of 1954, to the extent that they reflect ownership of the farmlands, improvements thereon, and equipment used thereon, are not within the reasonable needs of the business, but otherwise the accumulations at the end of 1954, if any, are within the reasonable needs of the business. Perhaps another way of saying this would be that the accumulations at the end of 1954 are not within the reasonable needs of the business to the extent of the equity of the petitioner in the farmlands, improvements thereon, and appurtenances thereto, including farm machinery. Decision will be entered imder Bule 50.