MOTOR FUEL CARRIERS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Motor Fuel Carriers, Inc. v. Commissioner
Docket No. 3517-74.
United States Tax Court
T.C. Memo 1975-296; 1975 Tax Ct. Memo LEXIS 75; 34 T.C.M. (CCH) 1290; T.C.M. (RIA) 75296; September 23, 1975, Filed William R. Frazier, for the petitioner. Robert P. Edler, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: The respondent determined deficiencies in the income tax of petitioner for the taxable years 1968, 1969, and 1970, in the amounts of $ 59,226.42, $ 63,140.24, and $ 51,490.36, respectively. The sole issue for decision is whether the petitioner is liable for the surtax under section 531[1] for the taxable years in question as having been availed of for the purpose of avoiding income tax with respect to its shareholders by permitting its earnings and profits to be accumulated instead of being divided and distributed. [2]
*77 FINDINGS OF FACT Some of the facts have been stipulated. Such facts and the exhibits attached thereto are incorporated herein by this reference. The petitioner is Motor Fuel Carriers, Inc. (hereinafter sometimes referred to as "petitioner"), a corporation organized under the laws of the State of Florida and having its principal place of business in Panama City, Florida. The petitioner timely filed its corporate income tax returns for the taxable years 1968, 1969 and 1970 with the Internal Revenue Service Center, Chamblee, Georgia, using the accrual method of accounting. The predecessor to the petitioner was incorporated in 1943 under the name of Motor Fuel Transport Company. As of September 1946, the only assets of the corporation consisted of operating certificates authorizing the transportation of petroleum and related products in the northern half of Florida, which included the cities of Jacksonville, Panama City, and Pensacola, and temporary authority to operate in Georgia and Alabama. In September 1946, John S. Espy purchased all of the capital stock of Motor Fuel Transport Company and began operations as Motor Fuel Carriers, Inc. Because the Interstate Commerce Commission *78 would not authorize the transfer of the temporary interstate authority to the petitioner, Espy made application with the Commission and obtained rights and permanent authority for delivery from points in Northern Florida into Alabama and Georgia. Mr. Espy transferred $ 5,000 and 5 tractors and 5 trailers to the corporation which were reflected on the books of the corporation as accounts payable to him. As of December 31, 1946, the petitioner had a deficit in its earned surplus account of $ 52,913. To satisfy the Interstate Commerce Commission, Mr. Espy agreed to transfer, as paid-in surplus, accounts payable to him in the amount of $ 45,292.67. Since that time all of the petitioner's investment in its corporate property and working capital has been generated by the retention of its earnings. After Mr. Espy commenced operations of the petitioner and for years thereafter as funds became available, the petitioner purchased additional equipment and gradually increased the size of its fleet of tractors and trailers for the principal business activity of highway transportation of petroleum products. The petitioner's traffic during these years originated at three Florida marine terminals, *79 one at Jacksonville, one at Panama City, and one at Pensacola. During the taxable years 1968 to 1970, inclusive, the petitioner derived its freight revenues from the following sources: 1968
Percent
1969
Percent
1970
Percent
Govern-
$ 578,876.83
29.77
$ 546,723.84
26.68
$ 601,722.75
27.54
ment
Standard
631,296.96
32.46
760,333.52
37.10
781,361.71
35.76
Oil
(Calif.)
Other
734,525.05
37.77
742,314.78
36.22
801,858.65
36.70
Total
$ 1,944,698.84
100.00
$ 2,049,372.14
100.00
$ 2,184,943.11
100.00
During the taxable years 1968 to 1970, inclusive, the petitioner's net income after deducting income taxes paid, and the depreciation per books on a straight line basis, reflected in the determination of such income [3], was as follows: 1968
1969
1970
Net income
$ 194,830.10
$ 147,683.89
$ 174,415.82
Depreciation
per books
167,146.89
165,332.05
199,902.64
Totals
$ 361,976.99
$ 313,015.94
$ 374,318.46
The petitioner's shareholders for the years 1968, 1969, and 1970, were as follows: Shareholder
1968
1969
1970
John S. Espy, Husband
3,656
3,610
3,546
Norma D. Espy, Wife
1,400
1,400
1,400
Allen T. Corbett, Jr.
7
7
7
John S. Coney
7
7
7
Norma Espy Phillips, Daughter
875
875
875
Norma Espy Phillips, Trust
90
113
135
Fleda Jane Espy, Trust
90
113
135
Fleda Jane Espy
875
875
875
Allyson Paige Phillips, Trust
0
0
20
Total shares outstanding
7,000
7,000
7,000
*80 The officers' salaries paid during these years were as follows: Officers
1968
1969
1970
John S. Espy, President
$ 36,000.00
$ 36,000.00
$ 36,000.00
Norma D. Espy, Treasurer
4,780.18
5,365.00
5,976.00
Allen T. Corbett, Jr.,
Vice President
15,519.42
17,375.22
18,997.70
John S. Coney, Secretary
and Bookkeeper
12,169.34
13,275.12
14,397.62
The petitioner has paid only one cash dividend from the date of its organization to December 31, 1970. This was in the amount of $ 20,000 paid during the taxable year 1956. In 1962 the petitioner capitalized $ 600,000 of its earnings and profits. During the taxable years 1956 to 1967, inclusive, the respondent determined that the petitioner had unreasonably accumulated its earnings and profits and accordingly determined deficiencies in tax for each of such years. The respondent's determination and the additional taxes paid on account thereof are shown in the following schedule. [4]
*81 Year
Sec. 531 Tax Proposed
Sec. 531 Tax Paid
1956
$ 19,011.44
$ 19,011.44
1957
21,492.12
21,492.12
1958
35,075.79
16,812.00
1959
40,354.72
23,984.29
1960
38,759.68
18 ,874.06
1961
47,254.42
27,064.49
1962
39,881.43
39,881.43
1963
34,219.16
0
1964
30,692.75
0
1965
25,269.53
0
1966
40,964.60
0
1967
20,811.04
10,405.52
TOTAL
$ 393,786.68
$ 177,525.35
On September 22, 1972, pursuant to section 534(b), respondent notified the petitioner of an intention to assert an accumulated earnings tax with respect to its taxable years 1968, 1969, and 1970. The petitioner timely filed a sworn statement pursuant to section 534(c) setting forth as grounds for the accumulation of earnings in those years, the following: (1) To meet the needs of the Company for working capital with which to conduct the day-to-day operations of its business, including but not limited to substantial investments in carrier operating and non-operating property. (2) To also meet the reasonable needs of the business including the reasonably anticipated needs thereof. The petitioner relied on contemplated expansion of its operating authority to include the Tampa *82 area as the factual basis for such anticipated needs. For the taxable years 1968 to 1970, inclusive, the respondent has determined that the petitioner has unreasonably permitted its earnings to accumulate for the purpose of avoiding the imposition of tax on its shareholders within the meaning of section 532. The petitioner contests that determination in this proceeding. If petitioner's earnings available for dividends had been distributed to Mr. and Mrs. Espy in proportion to the percentages of the shares they owned in petitioner, they would have incurred additional income tax by years, as follows: Year
Additional Income Tax
1968
$ 79,621.40
1969
86,480.82
1970
70,461.10
TOTAL
$ 236,563.32
In the minutes of a special meeting of the board of directors of the petitioner held on December 19, 1968, Mr. Espy, as chairman, set forth the reasons for expanding the operations of the petitioner to include Tampa, Florida, and stated that an application for authority to operate from that area would be filed "sometime during 1969." Mr. Espy estimated that such expansion would require an investment in excess of $ 950,000. In the event that the petitioner should fail *83 in its efforts to expand in the South Florida area, Mr. Espy proposed to use all of the cash on hand to completely modernize its fleet of trucks and trailers at an estimated cost of $ 750,000. Whereupon the board of directors adopted the following resolution: 'BE IT RESOLVED by the Board of Directors of Motor Fuel Carriers, Inc. that in view of the plans outlined by the Chairman for the expansion of the company's operations in South Florida either by way of acquisition of additional authority from the Florida Commission or purchase of existing authority and the uncertainties surrounding the traffic generated by the company by virtue of the Vietnam War, and the necessity for modernizing the company's fleet of trucks and trailers, and lastly in view of the contingent liability created by the Examining Agent in proposing the unreasonable accumulations earnings penalty tax for the company for the calendar years 1965-1967 in the amount of $ 87,045.17, the Board does hereby determine that good business practices dictate that Motor Fuel Carriers, Inc. retain all of its earnings realized for the period ended December 31, 1968, and for these reasons, no dividend shall be payable to its stockholders. *84 ' In the minutes of a special meeting of the board of directors of the petitioner held on December 12, 1969, Mr. Espy, as chairman, again stated that he had been working to obtain support for an application by petitioner for the authority to operate out of Tampa, Florida, and that such application had been filed with the Florida Public Service Commission. He estimated that an expenditure of as much as $ 1 million would be required to purchase real estate, construct terminal facilities, and purchase operating equipment. It was his opinion that the company should not expend any of the 1969 earnings and dividends but should retain all of its resources to meet these needs. Mr. Corbitt, a director and vice-president in charge of operations, further reported that no trailers and only 10 new tractors had been purchased during the year 1969, involving a total expenditure of $ 97,590. Mr. Corbitt estimated that at least triple that amount would be required in 1970. Whereupon the following resolution was adopted: 'BE IT RESOLVED by the Board of Directors of Motor Fuel Carriers, Inc. that because of the several unfavorable factors facing the company, as outlined by the President and Vice-President, *85 it is the decision of the Board of Directors that the cash position of the company should be maintained on as high a level as possible and that, for this reason, no dividend shall be payable to stockholders from earnings realized during the year ending December 31, 1969.' In the minutes of a special meeting of the board of directors of the petitioner held on December 31, 1970, Mr. Espy stated as Chairman that he wished to review the progress which had been made to expand the petitioner's operating authority to include Tampa, Florida. He reported that petitioner had filed a formal application on December 3, 1969, with the Florida Public Service Commission to add Hillsborough County as a point of origin for transporting petroleum products. The application was withdrawn on March 12, 1970, and an identical application was immediately refiled, in order that petitioner could present proof of inadequate service at Tampa during the months of January and February 1970. On December 3, 1970, the Commission had issued its order granting the application. Mr. Espy estimated the total cost to purchase, build and equip the Tampa terminal as being in excess of $ 950,000. He also estimated increased *86 operating expenses. Whereupon the following resolution was adopted: 'BE IT RESOLVED by the stockholders and Directors of Motor Fuel Carriers, Inc., that the corporation based on the facts and circumstances presented and explained by the Chairman shall under no circumstances pay a dividend in any amount to its shareholders for the year ended December 31, 1970, but instead shall retain all of its earnings after provision for its regular corporate income tax in order to have sufficient working capital to meet all of the requirements for installing, equipping and paying for the new Tampa truck terminal operation expected to commence business during the very near future.' In 1970, petitioner purchased land in Tampa for the purpose of building a terminal. An architect was engaged to draw up plans, in separate stages, for a terminal building, a repair shop and an addition to the terminal building. Each stage was contracted for without explaining to the architect what the full plans for the site were. At no time did the petitioner ask for advance construction estimates for the whole project. The contract for the terminal building was executed in November 1970 for $ 45,800. Bids on the *87 repair shop were due in April 1971. The total cost of that facility, after a change order, amounted to $ 68,519. Beginning in 1974, the petitioner let a contract for expansion of the terminal building at a cost of $ 39,597. In December, 1970, the petitioner contracted to buy 10 tank trailers for $ 115,000 with $ 5,000 down and 10 truck trailers for $ 110,000 with $ 2,500 down. Mr. Espy had estimated that an additional 15 new tractors and an additional 15 new trailers would be needed to commence operations from the Tampa terminal and would be purchased in 1971. The following is a condensed comparative statement of income and expenses of the petitioner for the taxable years 1968 to 1972, inclusive. The statement reflects depreciation taken per the taxpayer's books on a straight-line basis, rather than at the accelerated rates as shown by the tax returns: MOTOR FUEL CARRIERS, INC.
PANAMA CITY, FLORIDA
COMPARATIVE STATEMENTS OF INCOME AND EXPENSE
FOR THE YEARS ENDED DECEMBER 31, 1968, 1969, 1970, 1971 AND 1972
1968
1969
1970
OPERATING INCOME: Freight revenue
$ 1,944,698.84
$ 2,049,372.14
$ 2,184,943.11
Interest income
3,680.25
23,165.00
33,812.93
Income from non-carrier
5,843.93
6,379.39
9,689.70
operations
Other income
1,026.00
780.00
904.50
Total operating income
1,955,249.02
2,079,696.53
2,229,350.24
LESS: EXPENSES OTHER THAN
DEPRECIATION: Direct operating expenses: Transportation expenses
743,624.33
802,391.92
877,167.46
including drivers and
supervisors compensation
Equipment maintenance
230,235.88
287,598.88
322,748.53
Operating taxes and licenses
218,014.46
233,304.10
242,365.97
Insurance and safety expenses
74,748.26
73,039.36
73,806.68
Terminal expenses
54,264.82
57,858.65
60,056.89
Traffic expenses
3,326.70
3,381.98
1,849.35
Administrative and general
expenses: Salaries - general officers
40,780.48
41,365.00
41,976.00
Salaries - general office: Employees
44,815.98
50,019.30
53,134.39
Other general expenses
23,510.90
34,491.77
39,029.50
Interest expense
1,270.82
Total expenses other than
1,433,321.81
1,583,450.96
1,713,405.59
depreciation
Subtotal
521,927.21
496,245.57
515,944.65
Depreciation (straight-line
167,146.89
165,332.05
199,902.64
basis)
Subtotal
354,780.32
330,913.52
316,042.01
Income taxes
163,505.85
185,928.54
145,722.28
Remainder
191,274.47
144,984.98
170,319.73
Life insurance income: Increase in cash surrender value
17,751.93
16,895.21
15,079.95
Premiums paid
(14,196.30)
(14,196.30)
(13,723.45)
Net income (expense)
3,555.63
2,698.91
1,356.50
Extraordinary items: Recovery of interest from IRS
12,562.46
Additional income taxes paid on
(9,822.87)
prior years
NET INCOME TRANSFERED TO EARNED
$ 194,830.10
$ 147,683.89
$ 174,415.82
SURPLUS
*88 MOTOR FUEL CARRIERS, INC.
PANAMA CITY, FLORIDA
COMPARATIVE STATEMENTS OF INCOME AND EXPENSE
FOR THE YEARS ENDED DECEMBER 31, 1968, 1969, 1970, 1971 AND 1972
1971
1972
OPERATING INCOME: Freight revenue
$ 2,765,689.82
$ 3,046,638.83
Interest income
Income from non-carrier
14,868.63
11,084.67
operations
Other income
1,714.00
2,205.00
Total operating income
2,782,272.45
3,059,928.50
LESS: EXPENSES OTHER THAN
DEPRECIATION: Direct operating expenses: Transportation expenses
1,114,169.66
1,182,411.77
including drivers and
supervisors compensation
Equipment maintenance
462,923.36
442,090.17
Operating taxes and licenses
319,468.06
340,576.10
Insurance and safety expenses
139,222.85
167,789.69
Terminal expenses
77,212.07
81,383.06
Traffic expenses
2,499.01
2,825.37
Administrative and general
expenses: Salaries - general officers
44,094.00
44,220.00
Salaries - general office: Employees
56,669.20
59,151.08
Other general expenses
39,311.53
47,876.07
Interest expense
Total expenses other than
2,255,569.74
2,368,323.31
depreciation
Subtotal
526,702.71
691,605.19
Depreciation (straight-line
236,782.47
251,867.90
basis)
Subtotal
289,920.24
439,737.29
Income taxes
83,226.09
161,476.87
Remainder
206,694.15
278,260.42
Life insurance income: Increase in cash surrender value
17,570.44
17,570.44
Premiums paid
(13,723.45)
(13,723.45)
Net income (expense)
3,846.99
3,846.99
Extraordinary items: Recovery of interest from IRS
Additional income taxes paid on
prior years
NET INCOME TRANSFERED TO EARNED
$ 210,541.14
$ 282,107.41
SURPLUS
*89 The assets and liabilities of the petitioner, as reported by its Certified Public Accountants, for the taxable years 1968 to 1972, inclusive, were as follows: MOTOR FUEL CARRIERS, INC.
BALANCE SHEETS
1968
1969
1970
Current Assets: Cash on Hand and in Bank
$ 172,407.48
$ 187,337.46
$ 333,549.54
Accounts Receivable
86,452.61
82,825.44
141,385.14
Misc. Special Deposits
14,178.50
10,169.50
10,224.50
Temp. Cash Investments
300,000.00
501,216.50
0
Prepayments
19,557.88
25,861.24
29,002.04
Carrier Operating Property: Property Costs
1,894,952.78
1,964,822.69
2,415,139.65
Less: Accrued
Depreciation
994,363.71
1,120,436.12
1,077,977.64
Carrier Non-Operating Property: Property Costs
427,194.95
429,643.55
460,777.26
Less: Accrued
Depreciation
218,169.63
236,546.76
253,153.85
Other Assets: Operating Rights-Net
1,589.13
1,589.13
12,958.92
Cash Surrender Value of
Life Insurance
177,999.37
194,894.58
209,974.53
Misc. Investments
100.00
0
0
Other Deferred Debits
40.00
1,000.00
230,559.12
TOTAL ASSETS:
$ 1,881,939.36
$ 2,042,377.21
$ 2,512,439.21
Current Liabilities: Accounts Payable
$ 34,798.84
$ 49,211.48
$ 335,191.00
Wages Payable
4,462.43
7,441.73
11,790.53
Taxes Payable
21,302.78
16,147.12
21,224.79
Safety Bonus Payable
4,284.64
4,802.32
5,042.51
TOTAL LIABILITIES:
$ 64,848.69
$ 77,602.65
$ 373,248.83
Capital
Common Stock
$ 700,000.00
$ 700,000.00
$ 700,000.00
Donated Surplus
45,292.67
45,292.67
45,292.67
Earned Surplus
1,071,798.00
1,219,481.89
1,393,897.71
TOTAL SHAREHOLDERS' EQUITY:
$ 1,817,090.67
$ 1,964,774.56
$ 2,139,190.38
TOTAL LIABILITIES &
SHAREHOLDERS' EQUITY:
$ 1,881,939.36
$ 2,042,377.21
$ 2,512,439.21
*90 MOTOR FUEL CARRIERS, INC.
BALANCE SHEETS
1971
1972
Current Assets: Cash on Hand and in Bank
$ 160,004.85
$ 255,659.77
Accounts Receivable
85,085.89
120,345.40
Misc. Special Deposits
16,355.50
23,056.50
Temp. Cash Investments
0
0
Prepayments
73,054.18
32,894.28
Carrier Operating Property: Property Costs
2,847,448.70
2,943,930.54
Less: Accrued
Depreciation
1,205,964.11
1,175,137.53
Carrier Non-Operating Property: Property Costs
460,777.26
460,777.26
Less: Accrued
Depreciation
268,044.29
281,092.37
Other Assets: Operating Rights-Net
12,958.92
12,958.92
Cash Surrender Value of
Life Insurance
227,544.97
245,115.41
Misc. Investments
0
0
Other Deferred Debits
133,848.02
138,712.50
TOTAL ASSETS:
$ 2,543,069.89
$ 2,777,220.68
Current Liabilities: Accounts Payable
$ 167,344.49
$ 63,206.53
Wages Payable
19,291.36
14,554.70
Taxes Payable
337.50
61,564.73
Safety Bonus Payable
6,365.02
6,055.79
TOTAL LIABILITIES:
$ 193,338.37
$ 145,381.75
Capital
Common Stock
$ 700,000.00
$ 700,000.00
Donated Surplus
45,292.67
45,292.67
Earned Surplus
1,604,438.85
1,886,546.26
TOTAL SHAREHOLDERS' EQUITY:
$ 2,349,731.52
$ 2,631,838.93
TOTAL LIABILITIES &
SHAREHOLDERS' EQUITY:
$ 2,543,069.89
$ 2,777,220.68
*91 The asset account designated "Carrier Non-Operating Property" represented a tank storage facility in Panama City, Florida, completed by the petitioner in the taxable year 1962. The facility was under lease to La Gloria Oil and Gas Company and American Oil Company. By deed dated April 17, 1974, the facility was sold to La Gloria Oil and Gas Company for a price of $ 600,000. The cash surrender value of life insurance consisted of certain policies having a face value of $ 315,000, of which $ 300,000 represented insurance on the life of Mr. Espy and $ 15,000 represented insurance on the life of Mrs. Espy. The insurance was purchased during the taxable year 1955 and prior years. The asset account designated "Other Deferred Debits" included the purchase price of equipment on order for the taxable years 1970, 1971, and 1972, in the amounts of $ 225,500, $ 105,050, and $ 138,263, respectively. The balance due on account of such purchases was included in accounts payable. OPINION
At all times material herein the petitioner was a corporation, the stock of which was owned by Mr. John S. Espy and his immediate family. The petitioner was controlled by Mr. Espy. The petitioner has *92 been in the business of transporting petroleum and similar products since 1946. Notwithstanding the accumulation of earnings and profits amounting to $ 1,993,898 as of December 31, 1970, the petitioner has paid no dividends other than the distribution of $ 20,000 during the taxable year 1956. For the taxable years 1968 to 1970, inclusive, the petitioner realized earnings and profits (before section 531 tax) amounting to the sums of $ 168,421, $ 177,663, and $ 159,051, respectively. The respondent seeks to tax such earnings under section 531. Section 531 provides for the imposition of an accumulated earnings tax on every corporation described in section 532. Section 532(a) provides: SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule.--The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead *93 of being divided or distributed. As an evidentiary rule, section 533(a) provides as follows: SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose.--For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. Section 534 further provides that the burden of proof may be shifted to the respondent under certain conditions which the petitioner has failed to meet in this case. [5] With respect to the years involved, therefore, the question is whether the petitioner has, in the first instance, shown by a preponderance of the evidence that its earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. *94 As the record shows, this is not the first time the petitioner has been in the courts on account of its unreasonable accumulation of earnings and profits. Motor Fuel Carriers, Inc. v. United States,202 F. Supp. 497 (1962), 322 F.2d 576 (5th Cir. 1963), 244 F. Supp. 380 (N.D. Fla., 1965). Mr. Espy, who set the policy, seems to have gained little by that experience. With respect to the taxable year 1968, the petitioner contends that "the reasonable needs of its business" included the resources which might be required for the ultimate expansion of its authority to permit petitioner to haul petroleum and petroleum products from the point of origin in Tampa to other points in Florida. Such an expansion would unquestionably qualify as "reasonable" in light of petitioner's business. Insofar as the taxable year 1968 is concerned, however, the petitioner has failed to present proof of any definite plans for such expansion. See Motor Fuel Carriers, Inc., v. United States,supra; Bahan Textile Machinery Company v. United States,453 F.2d 1100 (4th Cir. 1972); Atlantic Properties, Inc., 62 T.C. 644 (1974). Except *95 for petitioner's testimony, the only proof consistent are self-serving minutes which were incorporated in a special meeting of the Board of Directors of December 19, 1968. Petitioner has a long history of mistaken reliance on such minutes. The situation was not much different as of December 31, 1969. Again, the petitioner relies almost exclusively on the minutes of a special meeting held on December 12, 1969. On December 3, 1969, or slightly more than a week before the meeting, petitioner filed an application with the Florida Public Service Commission to add Hillsborough County as a point of origin for transporting petroleum products. Any expenditure would necessarily be contingent upon the granting of that authority. The timing of the application, as well as its subsequent withdrawal, would indicate that the primary purpose of the application was to provide a reason for the failure to pay dividends, rather than the expectation that it would be acted upon favorably. [6]
During the months of January and February, 1970, there in fact *96 resulted a greater demand for the transportation of petroleum products from the Tampa area than the existing licensed carriers were prepared to meet. Because of this change, the petitioner withdrew the application which had been filed on December 3, 1969, and filed a new application. The petitioner also purchased the site for the Tampa terminal and engaged an architect to prepare plans for the facilities which would be erected on that site. The application was ultimately granted in December, 1970. As of December 31, 1970, the petitioner had the required authority to operate, and the expenditures which would foreseeably be incurred to undertake such operation must be considered in determining the reasonable needs of the business. As of December 31, 1970, petitioner thus had embarked upon a program for expansion in the Tampa area. The land had been acquired and the initial contracts had been let. Equipment had been ordered. Mr. Espy had estimated the total cost as being in excess of $ 950,000. Petitioner had available as of January 1, 1970, $ 187,337.46 in cash, $ 501,216.50 in cash investments, life insurance of a cash surrender value of $ 194,894.58, and a leased tank terminal carried *97 on its books at a cost of $ 429,643.55 and worth more. Total liabilities amounted to $ 77,602.65. For the taxable year 1970, petitioner's auditors reported a net income of $ 174,415.82 after deducting depreciation (a non-cash item) of $ 199,902.64. While the petitioner was faced with a contemplated expenditure of $ 950,000, ample resources to finance that expenditure were readily available regardless of whether dividends were paid to its shareholders for the taxable year 1970. The decision of the Board of Directors not to declare a dividend for the taxable year 1970, while ostensibly made in reliance upon the estimated cost of the Tampa expansion, was nothing more than a continuation of the policy adopted by Mr. Espy since he started the business in 1946 not to pay any dividends. It cannot be said that dividends would have been paid even if the certificate to operate had been denied by the Florida Public Service Commission. In accordance with section 532, the respondent has determined that for the taxable years 1968 to 1970, inclusive, petitioner was "availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits *98 to accumulate instead of being divided or distributed. " That is the ultimate issue to be decided. Section 533 provides that the fact that the earnings and profits are permitted to accumulate beyond the needs of the business shall be determinative of the purpose to avoid the income tax with respect to the shareholders unless petitioner shall, by a preponderance of the evidence, prove to the contrary. It does not necessarily follow that under all circumstances, proof of some business purpose for the accumulation will suffice to avoid the tax. The existence of a business purpose is merely a factor to be taken into account in determining intent. Young Motor Company v. Commissioner,339 F.2d 481 (1st Cir. 1964), affirming a Memorandum Opinion of this Court; Pelton Steel Casting Co., 28 T.C. 153 (1957), affd. 251 F.2d 278 (7th Cir. 1958), cert. denied 356 U.S. 958 (1958). When we look to the record in this case, it is clear that at all times it has been the intent of Mr. Espy to avoid the imposition of tax on the shareholders of petitioner by permitting its earnings and profits to accumulate instead of being divided or *99 distributed. That is his privilege. To enjoy that privilege, however, the petitioner must be prepared to pay the tax imposed under section 531. For the reasons stated, the determination of the respondent with respect to the tax imposed on petitioner under section 531 is sustained for the taxable years 1968 to 1970, inclusive. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated. ↩
2. In the petition, the petitioner also assigned as error, the respondent's application of the tax surcharge under Sec. 51, I.R.C. 1954 to the deficiencies resulting from the determination that petitioner's accumulated earnings and profits were subject to tax under Sec. 531. Petitioner did not pursue this assignment of error in its briefs. The respondent's determination is in accordance with Sec. 51. See Rev. Rul. 74-93, 1974-1 C.B. 13↩.
3. On its U.S. income tax returns petitioner deducted accelerated depreciation.↩
4. Refund litigation arising out of the corporation's determination of Sec. 531↩ tax in both years 1956 and 1957 resulted in the respondent's determination being sustained. The determinations for the other years were resolved by settlement.
5. Petitioner filed a statement under section 534 which set forth the corporate minutes and a summary of the financial statements relied on herein. For the reasons hereinafter stated, petitioner's statement would have been inadequate to shift the burden of proof.↩
6. The timing of the petitioner's actions was not much different than in Motor Fuel Carriers, Inc. v. United States,supra↩.