LAMARK SHIPPING AGENCY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lamark Shipping Agency, Inc. v. Commissioner
Docket No. 12326-79.
United States Tax Court
T.C. Memo 1981-284; 1981 Tax Ct. Memo LEXIS 456; 42 T.C.M. (CCH) 38; T.C.M. (RIA) 81284; June 11, 1981
*456 Hilary G. Lynch, for the petitioner. Stephen R. Takeuchi, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined deficiencies in petitioner's Federal income tax for investment credit recapture tax and accumulated earnins tax in the amounts of $ 286.88 and $ 31,811, respectively, for the taxable year ended September 30, 1976. Petitioner has conceded the correctness of the recapture tax. Thus, the only issue presented for decision is whether petitioner's accumulation of earnings during the taxable year in issue was beyond the reasoable needs of its business and for the purpose of avoiding income taxes with respect to its shareholders under section 532(a). [1] FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of fact and attached exhibits are incorporated herein by reference. Lamark Shipping Agency, Inc. (sometimes hereinafter referred to as petitioner or the Corporation) is a Pennsylvania corporation with its principal offices located in Pittsburgh, Pennsylvania. *457 Petitioner's income tax return for the taxable year ended September 30, 1976 was filed with the Internal Revenue Service Center in Philadelphia, Pennsylvania. Petitioner reports its income and expenses on the cash method of accounting. The business of petitioner was originally established as a sole proprietorship by Victor A. Lamark (Victor) in 1925, and was operated under the name Lamark Shipping Agency. Albert A. Lamark (Albert), Victor's brother, has been an employee of the business since 1930. The business was incorporated on October 13, 1966. Initially all the outstanding stock (2,000 shares) of the Corporation was held by Victor. Subsequently he transferred 100 shares to Albert, 100 shares to his nephew, Joseph J. Lamark, Jr. (Jay), and 30 shares to his sister, Rose Kozak. In January 1975 75 shares of Albert's stock were redeemed by the Corporation, and in Februry 1975, 10 shares of Rose Kozak's stock were redeemed. Victor was born in 1904 and Albert was born in 1900. Jay, born in 1940, worked for the Lamark Shipping Agency on a part-time basis during high school and college and became a full-time employee of the business in 1962. From October 14, 1966 through December *458 3, 1976, the board of directors of the Corporation consisted of Victor, Albert, and Jay. During this period the officers of the Corporation were Victor, President and Treasurer; Albert, Vice President; Jay, Secretary; and Gerald J. Hickly, Assistant Secretary and also the Corporation's accountant. At all times the business of the Corporation has been the solicitation of contracts for the transport of cargo and passengers in the international shipping trade. The Corporation's principal source of income is commissions paid by various international carriers. The commissions are computed as a percentage, usually 2-1/2 percent, of the total freight charge to the customers solicited by the Corporation for the shipping lines. The agency agreements entered into by the Corporation and the shipping lines have been limited to a specific geographical region in which the corporation is given the exclusive authority to solicit customers. At all relevant times petitioner's territory has been confined to Ohio, Western Pennsylvania, West Virginia, Kentucky, and part of New York. Petitioner is considered to be one of the leading interior shipping agencies in the country. The key to operating *459 a successful shipping agency such as petitioner lies in establishing agency relationships with as many lines as possible. Achieving this objective is difficult because a shipping agency can effectively represent only one line serving a particular global region. If that line chooses to take its business elsewhere or decides instead to open up its own office for handling cargo arrangements and customer solicitation, it often takes years for the agency to secure a new relationship with a competitive line in that region. To be successful the agency must also generate sufficient business to satisfy the principals which it serves. To achieve this end petitioner employs salesmen whose job it is to call on manufacturers and exporters located in the territories specified in the agency contracts and to secure cargo contracts for the lines which petitioner represents. In the vent either of the parties to the agency agreement becomes dissatisfied, the contracts normally allow for unilateral termination of the agreement upon 60 to 90 days notice to the other party. To maintain uniformity and stability in the rates charged by American and foreign lines, it is the general custom in the international *460 shipping industry for competing lines serving the same trade route to form an association known as a conference. Members of the conference are required to post a bond to insure their compliance with conference rules and regulations. All of the lines represented by the Lamark Shipping Agency prior to 1976 were conference lines. During the early 1970's the Corporation's major account was the Prudential-Grace line, which the Corporation and its predecessor had served since 1932. The line was originally know as the Grace line until it was sold to the Prudential line in 1970. Soon after the sale the new management informed the Corporation that it intended to phase out the line's agencies and establish its own offices in the United States and abroad to solicit business. In accordance with this plan the Prudential-Grace line terminated its agency relationship with the Corporation on March 31, 1975. On January 20, 1975, after receiving advance notice of the proposed termination, the directors of the Corporation held a special meeting to discuss the financial ramifications of losing the Prudential-Grace account. The minutes of that meeting are as follows: LAMARK SHIPPING AGENCY, INC. *461 Special Directors Meeting January 20, 1975 V. A. Lamark called the meeting to order and stated that the reason for the meeting was to discuss the fact that on January 15, 1975 they received a notice from Prudential Lines that our agency agreement would be terminated on March 31, 1975. This action they claimed was in line with their new policy to establish their own offices throughout the United States and also in foreign countries. We are the last inland agency to be terminated. After 43 years of continuous service starting with Grace Line in 1932 and then Prudential in 1970, we naturally regret losing this long-time association. V. A. Lamark noted that undoubtedly this will have considerable effect on our business as Prudential Lines was our number one account in 1974, having generated about 27 1/2% or our income. He further noted that every effort must be made to secure new accounts to offset this loss which will not be easy. Overtures have already been made to several lines but nothing tangible has developed. Meanwhile, every possible move must be made to economize on expenses. The reduction of personnel will have to be considered; however, it was pointed out that due to *462 the problem of obtaining good personnel this should only be considered as a least resort. A. A. Lamark noted that we cannot stimulate more business for the remaining three lines we represent as the economy is in a downward trend and indications are that this will continue throughout the current year, and we can expect the income from these lines to decline starting the first quarter of 1975 into 1976. V. A. Lamark stated that while 1974 was a banner year for our company, we are now faced with a gloomy picture which has been compounded by the loss of Prudential Lines. From 1967 through 1976 the Prudential-Grace Line generated the following commissions for petitioner: Taxable Year Ended
Commissions
Percentage of Gross
September 30
Received
Annual Revenues (Rounded)
1967
$ 113,209.96
59%
1968
102,841.20
58 1969
105,860.36
52 1970
94,352.92
41 1971
73,092.40
32 1972
51,403.04
23 1973
58,134.02
22 1974
55,255.11
13 1975
186,140.70
29  The large increase in commission income during fiscal year 1975 was attributable primarily to the payment by the Prudential-Grace line of accrued but unpaid commissions earned during the 1974 fiscal year, which amounts were paid shortly after the date of contract cancellation. *463 [2]
Petitioner made attempts to secure a replacement line to offset the loss of revenue caused by the termination of the Prudential-Grace contract but was unsuccessful. These efforts, as well as the financial impact of the lost commissions, were discussed at two special meetings of the board of directors on May 1, 1975 and September 2, 1975. The minutes of those meetings are as follows: LAMARK SHIPPING AGENCY, INC. Special Meeting of the Board of Directors May 1, 1975 4:30 P.M. The Meeting was called to order by the Chairman, V. A. Lamark. All Directors were present. The chairman stated that the meeting was held to review the present status and future potentials of our business. The loss of Prudential Lines on April 1, 1975, has created a serious problem and it is definite that we cannot maintain our present organization unless we secure some replacements for Prudential. *464 The chairman stated that very little if any reduction in operating costs can be made which might offset some of the large loss in revenues. Our business is developed through the contacts of our outside salesmen and any cutback in these activities would jeopardize our remaining four accounts. Negotiations which we had with the Spanish Line have broken off. They offered us a very limited agency arrangement but the small earnings were not worth while. We approached the Italian Lines and Finnlines and some interest in our organization was expressed. Neither one looks to be promising at this stage. Prudential Lines six months back log of commissions due us will help to carry us for a while. In view of this we agreed that it will be necessary to preserve our cash balance for the survival of the company. Our situation will need close attention and it was decided to hold a special meeting, if necessary, to determine which direction we will take. It was also discussed that there will be no salary increases at this time. LAMARK SHIPPING AGENCY, INC. Special Directors Meeting September 2, 1975 4:00 P.M. V. A. Lamark called the meeting to order and stated that the reason for the meeting *465 was to discuss the fact that since the last directors meeting May 1, 1975, we have made a number of contacts with steamship lines in New York and New Orleans to secure one or two replacements for Prudential Lines which terminated our agency agreement on March 31, 1975. Italian Lines who we had hopes of securing decided to appoint Seatrain Lines as their agent. The decision was based on Seatrains nation wide offices, which we could not match with our single office in Pittsburgh. At present there is no other line with whom we have pending negotiations so our situation is very precarious and will require some drastic action. V. A. Lamark pointed out that we are now operating at a loss and our cash reserve is gradually eroding. With no immediate prospect of obtaining new accounts and in order to keep our business solvent he suggested that the two senior officers step aside. No plan for phasing out was submitted but a thorough study will be made to work out the best method to terminate the senior officers by sometime in January, 1976. V. A. Lamark stated that he prefers that no publicity be given to this contemplated move since it could have a discouraging effect on the other members *466 of our organization. Sometime in the fall of 1975, approximately five or six months after the loss of the Prudential-Grace line, petitioner heard rumors to the effect that another major account, the Moller line, was about to open its own sales office in Pittsburgh and cancel its agency contract. Victor attempted to dissuade the Moller officials from doing so. Yet, despite his efforts, the Corporation received word on March 23, 1976, that the Moller Line was cancelling its agency contract effective September 1, 1976. From 1967 through 1976 the Moller Line generated the following commissions for petitioner: Taxable Year Ended
Commissions
Percentage of Gross
September 30
Received
Annual Revenues (Rounded)
1967
$ 25,060.92
13%
1968
29,151.28
16 1969
33,505.47
16 1970
39,377.19
17 1971
45,751.02
20 1972
54,743.00
25 1973
70,701.72
26 1974
126,203.35
31 1975
160,827.84
25 1976
212,608.74
43 The Corporation's income, expenses, and statement of financial position for the taxable years ended September 30, 1974 through 1976 are as follows: [3] *467 Income
For Taxable Year Ended *
Commissions (By
Shipping Line)
9/30/74
9/30/75
9/30/76
Moram
$ 10,000.00
Nawal Atlantic
$ 16,498.86
$ 17,599.81
22,075.54
Moller
126,203.35
160,827.84
212,608.74
Norwegian Carribean
67,497.05
101,730.79
97,437.45
Columbus
117,370.99
149,543.63
138,763.83
Prudential-Grace
55,255.11
186,140.70
Meyer
3,771.89
Group
5,540.93
Johnson ScanStar
6,094.27
Coles
1,700.91
Total Commissions
398,232.45
617,543.68
480,885.56
Other Income
5,275.46
18,023.89
11,817.58
Total Income
$ 403,507.91
$ 635,567.57
$ 492,703.14
Expenses
For Taxable Year Ended * *468 9/30/74
9/30/75
9/30/76
Officers Salaries
$ 126,300.00
$ 159,800.00
$ 56,500.00
Other Salaries
69,125.00
86,527.00
84,455.00
Solicitation and Travel
34,526.14
40,662.90
44,116.24
Telephone
22,573.92
19,732.02
18,230.06
Rent
16,756.46
16,854.81
21,677.72
Profit Sharing Plan
Contributions
25,000.00
52,734.85
11,000.00
Federal and State Income
Taxes
23,170.26
98,350.08
83,155.86
Depreciation and
Amortization
3,043.50
6,164.55
5,226.64
Other Expenses
45,478.18
48,631.32
57,143.95
Total Expenses
$ 365,973.46
$ 529,457.53
$ 381,505.47
Financial Position
For Taxable Year Ended
Assets
9/30/74
9/30/75
9/30/76
Cash
$ 67,920.16 $ 85,673.45 $ 19,529.76 U.S. Treasury Bills
71,057.80 167,662.40 Miscellaneous
Receivables
75.61 304.36 262.94 Prepaid Rent
534.00 534.00 Loan Receivable-Jay
Lamark
* *469 56,500.00 Cash Surrender
Value-Life
Insurance
7,026.10 7,026.10 Equipment, Furniture,
and
Leasehold Improvements
24,535.25 34,400.29 31,945.55 Accumulated
Depreciation
(18,843.25)
(17,207.80)
(18,893.89)
Total Assets
$ 152,305.67 $ 278,392.80 $ 89,344.36 Liabilities
Taxes Payable
$ 19,053.27 $ 44,694.25 $ 972.94 Note
Payable-Pittsburgh
National Bank
47,088.35 19,053.27 44,694.25 48,061.29 Stockholder's Equity
Common Stock
20,000.00 20,000.00 1,010.00 Treasury Stock
(5,663.55)
(293,292.95)
Retained Earnings
113,252.40 219,362.10 333,566.02 Total Liabilities and
Stockholder's Equity
$ 152,305.67 $ 278,392.80 $ 89,344.36 During fiscal year 1975 the officers of the Corporation were paid the following compensation: Total Compensation
Year-end
Officer
(Including Year-end Bonus)
Bonus
Victor Lamark
$ 75,000
$ 36,000
Albert Lamark
48,900
31,000
Jay Lamark
35,900
8,000
Total
$ 159,800
$ 75,000
Despite the loss of the Prudential-Grace and Moller lines, the Corporation's commission income remained fairly stable during the 1976 fiscal year and surpassed the amounts received in fiscal 1974, a year which the corporate minutes had characterized as a "banner year" for the Corporation. This was attributable to several factors, including increased commission rates negotiated by petitioner with some of the lines, the expansion of export services by some of the lines, and a general boom in the export and passenger shipping business. For the taxable year ending September 30, 1977, petitioner reported gross income of $ 503,396.25 and taxable income of $ 74,303.98 on its Federal corporate income tax return. In that year Jay received $ 100,100 in officer's compensation. For the taxable year ending September 30, 1978, petitioner reported gross income of $ 344,017.87 and taxable *470 income of $ 8,900.61, and Jay was paid only $ 55,750 in officer's compensation. In the course of attempting to secure new lines to offset the loss of the Moller and Prudential-Grace lines, a conflict developed between Victor and Jay over whether to take on a Russian line which had recently commenced service between the United States and the Far East. The individual who headed the Russian line's operations in the United States was an American who at one time had been president of the Grace Line, and who was acquainted with the owners of the Lamark Shipping Agency. On several occasions he approached them about the possibility of representing the Russian line. Alarmed about the loss of two of the Corporation's biggest lines, Jay was in favor of taking on the Russian representation. Victor, on the other, was staunchly opposed to such action because the line was a nonconference line and used what he felt were unfair trade practices to snatch business from competing conference lines. In addition, he felt that representation of the line would irritate the other conference lines represented by the Corporation, and would also damage its relationships with the various exporters and shippers *471 from whom it solicited business. After Victor's retirement in 1976 the Corporation became the agent for the Russian line. Although he was 72 when he divested his stock ownership in the Corporation, Victor was in good health and would have preferred to continue working with the company. However, he felt that this was not feasible for two reasons. First, he and Jay were at loggerheads over the Russian line issue and also had other disagreements concerning plans for the longrange future of the Corporation. These disagreements were serious enough that at one point Jay had considered leaving the company. Second, Victor became convinced, following the loss of two of its biggest accounts, that the Corporation would soon to under, and in any event could not continue to pay the large salaries which the officers had been receiving. He felt it was too risky, from a personal investment standpoint, to retire and remain a passive stockholder. Therefore, he decided to get out of the business altogether. He considered and rejected the alternative of liquidating the Corporation, partly because of his reluctance to terminate a 50-year old family business, and partly out of a sense of loyalty *472 to the company's employees, some of whom had been with the company for many years. Eventually he settled on a plan where all but one share of his stock would be redeemed by the Corporation, with the remaining share to be purchased individually by Jay. It was further decided that the stock of Albert and Rose Kozak would also be redeemed, thereby vesting complete ownership of the Corporation in Jay. The stock ownership of the Corporation prior to the implementation of this plan was as follows: Number of
Percent of Total
Shares Owned
Shares Outstanding
Victor Lamark
1,770
92.43%
Albert Lamark
25
1.31 Jay Lamark
100
5.22 Rose Kozak
20
1.04 Total
1,915
100.00%
On May 25, 1976, Albert was paid $ 5,000 in the complete redemption of his 25 shares of stock of the Corporation. On June 1, 1976, Rose Kozak was paid $ 4,000 in the complete redemption of the 20 shares owned by her. To redeem 1,769 of the 1,770 shares owned by Victor, the Corporation paid him $ 283,271.91 in cash on July 16, 1976, and also transferred to him an automobile with an adjusted basis to the Corporation of $ 5,313.64 and a life insurnce policy on his life with a cash surrender value of $ 9,032.85. The redemption proceeds were reported *473 by Victor on his 1976 Federal income tax return as a distribution qualifying for long-term capital gain treatment. The income tax savings to Victor as a consequence of reporting the $ 283,271.91 cash payment alone as a capital gain distribution versus an ordinary income dividend amounted to $ 63,059.18. The remaining share of stock owned by him was sold to Jay for $ 60,000 pursuant to an agreement executed on February 28, 1976 contemporaneously with the stock redemption agreement between Victor and the Corporation. The purpose of this arrangement was to require Jay to pay a premium out of his personal assets for the transfer of control of the business brought about by the redemption of Victor's stock. The gain on this sale was reported on his 1976 Federal income tax return as long-term capital gain. The agreement between Jay and Victor provided that Victor would be liable for a pro rata share of any additional Federal income taxes resulting from an Internal Revenue Service audit for the taxable year ending September 30, 1976, with the amount of the liability to be based on that portion of the year during which he was a shareholder of the Corporation. The agreement further provided *474 that Victor would continue to remain available for advisory and consulting services during 1977 and 1978 and that office space would be furnished him by the Corporation for a perod of one year. In February 1976 the petitioner borrowed $ 80,000 from the Pittsburgh National Bank and Jay personally guaranteed the loan. Petitioner loaned $ 60,000 of the proceeds to Jay to enable him to finance the purchase of the single share of stock from Victor. Since the redemptions had exhausted nearly all of the Corporation's working capital, it was necessary to retain $ 20,000 of the loan proceeds in the business to meet operating expenses. By September 30, 1976, petitioner had made principal payments totaling $ 30,000 on the $ 80,000 loan. [4] Certain internal memoranda prepared by officials of the Pittsburgh National Bank in the course of making the loan to petitioner indicate that the bank considered the Corporation to be a sound credit *475 risk. A memorandum dated January 14, 1976 provided, in part, as follows: Lamark Shipping has been a customer of Pittsburgh National for over forty years, and all principals are well known to the Oliver office. The company has very little in fixed assets; their main strength is their solid ties with the ocean carriers and shippers in a five state area. Even though net worth of the company will be approximately $ 45,000 after retirement of the stock, the ability to generate gross revenue of $ 264,191 in 1973; $ 403,507 in 1974; $ 635,567 in 1975 shows the viability of the company. Much of the latter growth is due to Jay's efforts. Net income is misleading as the elder Lamarks have enjoyed substantial salaries and generous expense allowances. Net income in 1975 was $ 106,109 after salary expense of $ 246,327, travel of $ 40,000 plus club dues and public relations of $ 12,000+. The elder Lamarks will not draw any of these expenses after the sale. A subsequent memorandum dated February 19, 1976, also discussed the prospects of the Corporation and provided in relevant part: Long term outlook based on increasing international trade from within their trading area is excellent. They *476 also show good growth and excellent potential in selling passenger space. Petitioner paid only one dividend from the date of incorporation through September 30, 1977. That dividend totaled $ 8,000 and was paid during the taxable year ended September 30, 1974. On April 6, 1979, respondent informed petitioner of a proposed statutory notice of deficiency for accumulated earnings taxes under section 531 for the taxable years ended September 30, 1975 and 1976. On May 14, 1979, petitioner submitted to respondent a statement pursuant to section 534(c) which alleged that the earnings in question were accumulated "to protect the corporation from the drastic financial consequences attendant upon the loss of major accounts, not to redeem stock". In the alternative, the statement alleged that "even if the surplus had been accumulated to redeem V. A. Lamark's stock, this would have been an accumulation to meet reasonable needs under the applicable cases." On May 24, 1979, respondent mailed a statutory notice of deficiency to petitioner wherein respondent determined that petitioner was liable for accumulated earnings taxes for the taxable year ended September 30, 1976 in the amount of $ 31,811. *477 [5] On September 4, 1980, this Court ordered the burden of proof shifted to respondent with regard to the grounds alleged in the section 534(c) statement. OPINION The accumulated earnings tax is designed to foster the payment of dividends to the shareholders of a corporation by imposing a penalty tax on accumulated earnings and profits in excess of the reasonable needs of the business. Because the tax is in the nature of a penalty it must be narrowly construed. Ivan Allen Co. v. United States, 422 U.S. 617, 626 (1975). The tax is imposed by section 531 and applis to any corporation "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed." Section *478 532(a). In United States v. Donruss Co., 393 U.S. 297 (1969), the Supreme Court held that tax avoidance need only be one of the purposes which contributed to the decision to accumulate, rather than the dominant or controlling purpose. Section 533(a) provides that the accumulation of earnings beyond the reasonable needs of the business is determinative of the existence of a tax avoidance purpose unless the corporation proves otherwise by a preponderance of the evidence. The concept of "reasonable needs of the business" is also important in the computation of the tax, since section 535(c)(1) allows a credit against the accumulated taxable income subject to the tax for the amount of any current earnings and profits which are retained by the corporation for its reasonable business needs. Thus, even if tax avoidance is found to have played a role in the decision to accumulate, the taxpayer can still escape the tax to the extent that it can prove its accumulation of current earnigns was necessary to meet reasonable business needs, thereby reducing or eliminating its accumulated taxable income by way of the accumulated earnings credit. [6] See, e.g., Magic Mart, Inc. v. Commissioner, 51 T.C. 775, 799 (1969); *479 Faber Cement Block Co., Inc. v. Commissioner, 50 T.C. 317, 336 (1968); John P. Scripps Newspapers v. Commissioner, 44 T.C. 453, 474 (1965). The determination of the reasonable needs of the business is strictly a factual question, Helvering v. National Grocery Co., 304 U.S. 282 (1938); Doug-Long, Inc. v. Commissioner, 72 T.C. 158, 170 (1979), supplemental opinion 73 T.C. 71 (1979), on appeal (2d Cir., Jan. 11, 1980); and in this respect we are to give due deference to the business judgment of corporate management. Atlantic Properties, Inc. v. Commissioner, 62 T.C. 644, 656 (1974), affd. 519 F.2d 1233 (1st Cir. 1975); Magic Mart, Inc. v. Commissioner, supra at 795; Faber Cement Block Co., Inc. v. Commissioner, supra at 329. According to section 537(a)(1), the phrase "reasonable needs of the business" includes "reasonably anticipated needs of the business." In this regard, section 1.537-1(b)(1), Income Tax Regs., *480 provides as follows: In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. Although the regulation refers to "specific, definite and feasible plans" for the accumulation, in a closely held corporation this plan need not be inscribed in formal minutes. Doug-Long, Inc. v. Commissioner, supra at 171; *481 John P. Scripps Newspapers v. Commissioner, supra at 469. At a minimum, however, the stated intentions of the taxpayer regarding the use of the accumulated earnings must be evidenced by some contemporaneous course of conduct consistent with the projected use; in other words, conduct which would indicate that the plans were not merely formulated as an afterthought in response to a challenge from the Commissioner. Motor Fuel Carriers, Inc. v. Commissioner, 559 F.2d 1348, 1352-1353 (5th Cir. 1977); Bahan Textile Machinery Co. v. United States, 453 F.2d 1100, 1102 (4th Cir. 1972); Smoot Sand & Gravel Corp. v. Commissioner, 274 F.2d 495, 499 (4th Cir. 1960), cert. denied 362 U.S. 976 (1960). The determination of whether the immediate or projected needs of the business reasonably required the accumulation is based on the facts as they exist at the close of the taxable year in question, although subsequent events may be considered in determining whether the taxpayer actually intended to consummate the plans it alleges for the accumulation. Dixie, Inc. v. Commissioner, 31 T.C. 415, 430 (1958), affd. 277 F.2d 526 (2d Cir. 1960), cert. denied 364 U.S. 827 (1960); Faber Cement Block Co., Inc. v. Commissioner, supra at 333; *482 section 1.537-1(b)(2), Income Tax Rags.
Once the reasonable needs of the corporation have been ascertained, the next step is to determine whether its earnings and profits were permitted to accumulate beyond those needs. Normally this requires more than a simple comparison of the corporation's total accumulated earnings and profits with its business needs. Because some of these earnings may be held in the form of illiquid assets such as land, plant and equipment, and thus may not be available for current distribution to shareholders, the focus generally is on the net liquid assets of the business and whether they exceed the immediate or reasonably anticipated needs of the business. See Ivan Allen Co. v. United States, 422 U.S. 617, 628 (1975) ("The question, therefore, is not how much capital of all sorts, but how much in the way of quick or liquid assets, it is reasonable to keep on hand for the business."); Smoot Sand & Gravel Corp. v. Commissioner, supra at 501; Montgomery Co. v. Commissioner, 54 T.C. 986, 1008 (1970); Faber Cement Block Co., Inc. v. Commissioner, supra at 328; section 1.537-2(b), Income Tax Regs. It should be emphasized that the accumulated earnings tax applies *483 only to current year's accumulated taxable income as that term is defined in section 535; previously accumulated earnings are not subject to the penalty. However, prior year's accumulations are relevant in the computation to the extent they are available in the form of liquid assets to meet the taxpayer's current needs and render the accumulation of current earnings unnecessary. [7]Bahan Textile Machinery Co. v. United States, supra at 1102; Smoot Sand & Gravel Corp. v. Commissioner, supra at 500-501; JJJ Corp. v. United States, 217 Ct. Cl. 132, 576 F.2d 327, 342 (1978); section 1.535-3(b)(1)(ii), Income Tax Regs.
Petitioner timely submitted a statement pursuant to section 534(c) [8] *485 in which it alleged that the earnings and profits for the taxable year ended September 30, 1976, were accumulated in order to protect the corporation against the loss of major accounts, and not for the purpose of funding the stock redemptions which took place during that year. The statement further alleged that, should this Court determine that current earnings were actually accumulated for the latter purpose, the redemption of Victor Lamark's stock nevertheless served a reasonable *484 business need for purposes of the accumulated earnings tax. No other grounds for the accumulation were contained in the statement. At a pre-trial hearing this Court ruled that the section 534(c) statement was sufficient to shift the burden of proof to respondent with respect to the grounds stated therein in accordance with section 534(a)(2). We note, however, that the burden of proof with respect to any additional grounds alleged by petitioner, as well as the ultimate question of whether the Corporation was availed of for the prohibited purpose, remains with petitioner. Pelton Steel Casting Co. v. Commissioner, 28 T.C. 153, 183-184 (1957), affd. 251 F.2d 278 (7th Cir. 1958), cert. denied 356 U.S. 958 (1958); Wellman Operating Corp. v. Commissioner, 33 T.C. 162, 182 (1959). The parties in this case have confined their arguments to the familiar issues of whether *486 the accumulation of earnings during the year was for the reasonable needs of the business and not for the purpose of avoiding income taxes. Nevertheless, the facts fairly present another, more fundamental legal issue which neither party has addressed: whether the distribution of all of petitioner's current earnings and profits in the redemption of its stock during the year bars the imposition of the penalty on the ground that no earnings were actually permitted to accumulate within the corporation. The facts herein indicate that the portion of the redemption distributions allocable to earnings and profits greatly exceeded petitioner's earnings and profits for its fiscal year ended September 30, 1976. The amounts distributed in the redemptions were as follows: Victor Lamark (1,769 shares)
Cash
$ 283,271.91
Cash surrender value-life
insurance policy
9,032.85
Automobile (adjusted basis)
5,313.64
$ 297,618.40
Albert Lamark (25 shares)
Cash
5,000.00
Rose Kozak (20 shares)
Cash
4,000.00
Total
$ 306,618.40
Section 312(a) [9] *488 provides that amounts paid in connection with a redemption of stock are treated as distributions of earnings and profits to the extent they are not properly chargeable to the capital *487 account under section 312(e). [10] Further, section 316(a) [11] *489 provides that such distributions are to be charged first against the most recently accumulated earnings and profits. The facts indicate that each share of stock had a par value of $ 10. [12] Consequently, of the total amount distributed in the redemptions, $ 18,140 ($ 10 per share X 1,814 shares redeemed) is properly chargeable to the capital account under section 312(e). [13] The balance of the distribution, or $ 288,478.40, is treated as a distribution out of current earnings and profits to the extent thereof under the provisions of section 312(a) and 316(a). Thus, since petitioner's earnings and profits for its fiscal year ended September 30, 1976, amounted to only $ 111,197.17, [14] it can be argued that petitioner did not actually accumulate any earnings during the year and that the imposition of the accumulated earnings tax under such circumstances is inappropriate. In GPD, Inc. v. Commissioner, 60 T.C. 480 (1973) (Court-reviewed), *490 revd. and remanded 508 F.2d 1076 (6th Cir. 1974), this Court decided this issue in favor of the taxpayer on similar facts and was reversed on appeal by the Sixth Circuit. Inasmuch as this case is appealable to the Third Circuit, we are not constrained to follow the Sixth Circuit's reversal under the rule of Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971) therefore the matter is open for our reconsideration. However, because neither party has raised or briefed the merits of what has proved to be a fairly nettlesome legal issue, we think it inappropriate to undertake a reassessment of our position in GPD at this time. [15] *491 *492 *493 Accordingly, we will decide this case solely on the basis of the arguments raised at trial and briefed by the parties. We are confronted, then, with the question of whether the hypothetical accumulation of current earnings (resulting from a failure to distribute such amounts in the form of taxable dividends) exceeded petitioner's reasonable business needs during the year in issue. Normally this determination requires a comparison of the corporation's net liquid assets at year-end (generally current assets minus current liabilities) to its aggregate business needs. If net liquid assets are found to exceed business needs, a presumption is created that current earnings were accumulated with a tax avoidance motive. Section 533. Assuming the taxpayer is unable to rebut this presumption, the only *494 issue left to be decided is the amount of the accumulated earnings credit. In the present case, however, a substantial portion of petitioner's current and accumulated earnings and profits were distributed during the year, nearly all of it in the form of cash, in order to redeem the stock of several of its shareholders. Because the use of funds to redeem stock does not necessarily qualify as a reasonable business need, particularly where the facts suggest that the redemption is primarily a device to bail out earnings and profits at capital gain rates, the Corporation's net liquid assets at year-end ($ 28,231.41) [16] *496 *497 paint a completely misleading picture of its ability to pay dividends during the taxable year.By contrast, had the Corporation elected to invest its idle cash in the acquisition of additional plant and equipment during the year, the year-end net liquid assets figure would be an appropriate measure of its dividend-paying capacity because the use to which the excess funds were directed would unquestionably constitute a reasonable business need. Thus, it becomes necessary to examine the circumstances surrounding the redemptions to determine whether they served a reasonable *495 business purpose. If this question is answered in the negative, the assets distributed must be considered in the same light as unrelated business investments or shareholder loans; i.e., the amounts must be added back to the corporation's net liquid assets and deemed available for the payment of dividends. [17] See and compare Faber Cement Block Co, Inc. v. Commissioner, supra at 328-330 (unrelated business loans included in liquid assets); Nemours Corp. v. Commissioner, 38 T.C. 585, 602-604 (1962), affd. per curiam 325 F.2d 559 (3rd Cir. 1963) (loans to shareholders included); Bremerton Sun Publishing Co. v. Commissioner, 44 T.C. 566, 587 (1965) (investment in stock of another company to insure an adequate supply of material used in business not included); John P. Scripps Newspapers v. Commissioner, supra at 472 (investment in preferred stock not a liquid asset where income therefrom used to fund company profit sharing plan). On brief respondent contends that the shift in burden of proof ordered by this Court after consideration of petitioner's section 534(c) statement is ineffective with regard to the redemption issue, since *498 the statement specifically denied that earnings were accumulated for the purpose of redeeming stock. We note, however, that petitioner has not denied the fact of the redemptions; rather, petitioner contends that it did not form an intention to redeem its stock until just before the distributions took place. Until that time, it alleges, it sole purpose in accumulating earnings was to protect against the loss of accounts. Thus, petitioner insists that at no time did it actually accumulate earnings, on a day-to-day basis, with the purpose of avoiding income taxes by distributing earnings in a stock redemption. Petitioner's argument ignores the fact that all the events of the taxable year are relevant in determining whether earnings were accumulated with the proscribed purpose. See JJJ Corp. v. United States, 217 Ct. Cl. 132, 576 F.2d 327, 344 (1978). Still, petitioner was careful to argue (and at some length) in its 534(c) statement that, assuming this Court found the redemption of Victor Lamark's stock to be relevant in determining the existence of the forbidden purpose, the redemption nevertheless served a reasonable business need of the Corporation. We see no reason to disregard *499 this portion of petitioner's statement merely because it couched the redemption as an alternative, rather than a conjunctive, ground for the accumulation of corporate earnings. We hold, therefore, that respondent bears the burden of proof on the question of whether the redemption satisfied a reasonable business need. Before addressing the arguments of the parties on this issue it is helpful first to restate the changes in stock ownership which took place during the year in issue. At the beginning of the year petitioner's stock was held as follows: Number of
Percent of Total
Shares Owned
Shares Outstanding
Victor Lamark
1,770
92.43%
Albert Lamark
25
1.31 Jay Lamark
100
5.22 Rose Kozak
20
1.04 Total
1,915
100.00%
The shares owned by Albert Lamark and Rose Kozak were redeemed on May 25, 1976 and June 1, 1976, respectively. On July 16, 1976, 1,769 shares of Victor Lamark's shares were redeemed, representing 94.6 percent of the 1,870 shares then outstanding. Victor sold his remaining share of stock to Jay Lamark for $ 60,000, thereby giving Jay sole ownership and control of the Corporation. In substance the redemption provided a vehicle through which the Corporation's retained earnings could be used *500 to bootstrap the acquisition of the company by Jay, who apparently lacked sufficient personal assets to purchase all of Victor's stock directly. Because the assets distributed to Albert and Rose were insubstantial ($ 9,000) relative to the total distributed to Victor ($ 297,618.40), the remainder of our discussion will focus solely on the redemption of Victor's stock. [18]
Petitioner maintains that this redemption and the transfer in ownership which accompanied it was essential if the business was to continue to operate as a going concern. In support thereof petitioner contends the following: (1) Victor and Jay anticipated serious financial difficulty in the face of the loss or impending loss of two of its major accounts, the Prudential-Grace and Moller lines, and thus they felt the Corporation could not afford to continue to pay the large salaries which the officers had been receiving. (2) Dissension had arisen between Jay and Victor over whether to take on representation of a nonconference Russian line. The two also had disagreements over other *501 policy matters, and at one point Jay gave serious consideration to leaving the Corporation. (3) Because of his problems with Jay and his belief that the business was headed downhill, Victor decided it was time to cash in his investment, even though he was in good health and would have preferred to continue working with the company. (4) Rather than liquidate the 50-year old family business and dismiss loyal employees, Victor chose to transfer control of the Corporation to Jay by selling one share of stock to him directly and causing the Corporation to redeem the remainder. In short, petitioner argues that, because of the business reversals and the disagreements with Jay, Victor decided it was necessary to leave the company and allow Jay the opportunity to make a fresh start unencumbered by the burdensome salaries which Victor and Albert had been drawing. Since the only other alternative was liquidation, or so petitioner contends, the redemption necessarily satisfied a reasonable business purpose. Respondent insists that the redemption was nothing more than a device employed by a majority stockholder to bail out current earnings and profits at capital gains rates, and therefore *502 the purpose of the redemption was inherently personal. Further, respondent argues that current earnings could have been distributed in the form of dividends without necessarily making it impossible for the planned redemption to occur. Finally, respondent argues that the alleged business purpose for the redemption, which depleted almost all of petitioner's accumulated cash reserves, is belied by petitioner's repeated averments of a desperate need to conserve working capital during the year in issue. Thus, respondent maintains this redemption cannot pass muster as a reasonable business need for purposes of the accumulated earnings tax. The cases dealing with the reasonable needs issue in a redemption context are difficult to reconcile and can hardly be said to constitute a uniform body of law on the subject. No doubt this is due in large measure to the difficulties inherent in attempting to distinguish between corporate and shareholder purposes in a closely held corporate setting. In most cases the presence of a shareholder benefit is readily discernible because the redemption proceeds are invariably taxed to the departing shareholders at favorable capital gain rates. Since capital *503 gain distributions are not the kind of distributions which the accumulated earnings tax was designed to promote, [19] the courts have been understandably reluctant to accord "reasonable need" characterization to earnings accumulated for the purpose of a redemption. Nevertheless, the redemption of a dissenting minority or 50 percent shareholder has been found to serve a reasonable business purpose where the action appeared necessary to promote the harmonious transaction of corporate business or to prevent the sale *504 of the minority stock to a hostile outsider.The case frequently cited for this proposition is Mountain State Steel Foundries, Inc. v. Commissioner, 284 F.2d 737 (4th Cir. 1960), revg. T.C. Memo. 1959-59. In that case the stock of Mountain State Steel was owned equally by two families. The Stratton family was aggressive and wanted to plough corporate profits back into the business in order to expand and modernize. The Miller family, consisting of the widow and daughters of one of the original founders of the business, was more conservative and preferred greater financial security than the uncertain flow of dividends from the corporation would provide. Eventually the widow demanded that the business be sold, but no purchasers were found who were willing to pay the desired price. An agreement was finally reached whereby the corporation agreed to redeem the Miller stock for $ 450,000, payable $ 50,000 in cash with the balance to be paid in installments over a period of years. The Commissioner asserted an accumulated earnings tax deficiency in the year of redemption and the three subsequent years. The Fourth Circuit disagreed, concluding that on the facts presented the accumulations *505 in the year of redemption and in later years to discharge the resulting indebtedness served a legitimate corporate purpose, as follows (284 F.2d at 745): When the stockholders have such conflicting interests, the corporation and its future are necessarily affected. When the situation results in demands that the business be sold or liquidated, as it did here, the impact of the conflict upon the corporation is direct and immediate. * * * The resolution of such a conflict, so that the need of the corporation may govern managerial decision, is plainly a corporate purpose. Other cases embracing the notion that the redemption of a non-controlling interest may serve a reasonable business need where a corporate purpose is evident are Dill Manufacturing Co. v. Commissioner, 39 B.T.A. 1023 (1939); Gazette Publishing Co. v. Self, 103 F. Supp. 779 (E.D. Ark. 1952); Wilcox Manufacturing Co., Inc. v. Commissioner, T.C. Memo. 1979-92; Farmers and Merchants Investment Co. v. Commissioner, T.C. Memo. 1970-161. Compare John B. Lambert & Assocs. v. United States, 212 Ct. Cl. 71 (1976), (38 AFTR 2d 76-6207, 76-2 USTC par. 9776); Cadillac Textiles, Inc. v. Commissioner, T.C. Memo. 1975-46. The leading *506 case concerning the redemption of a majority stock interest is Pelton Steel Casting Co. v. Commissioner, 28 T.C. 153 (1957), affd. 251 F.2d 278 (7th Cir. 1958), cert. denied 356 U.S. 958 (1958). There two shareholders, one owning 60 percent of the corporation and the other owning 20 percent, decided to sell their stock but were unable to find a purchaser who could meet their price. A third shareholder, who owned the remaining 20 percent of the stock, had devoted most of his life to the business and was concerned that a sale of the majority interest to another corporation would interfere with his management of the business and possibly cause the loss of some key employees. Accordingly, he devised a plan whereby the corporation would redeem the shares for approximately $ 800,000, with $ 300,000 payable out of the corporation's liquid assets and the balance to be paid from the proceeds of a $ 500,000 loan. To insure the availability of the necessary cash the corporation declared no dividends for 1946.The redemption took place the following year. Subsequently the Commissioner determined an accumulated earnings tax deficiency for 1946 on the ground that the accumulation for the proposed *507 redemption did not serve a reasonable business need, but instead indicated a purpose to avoid income taxes. This Court sustained the Commissioner's determination and cited several factors as the basis for its decision. First, we observed that a dividend distribution would not necessarily have made it impossible for the proposed redemption to occur, since the distribution presumably would have resulted in a corresponding reduction in the redemption price to be paid by the corporation. Second, we were unable to identify any reasonable corporate purpose served by the redemption. There was no evidence that the company was threatened with a sale of stock to an undesirable outsider. In fact, from a corporate standpoint the redemption may well have been counter-productive, since it caused a significant drain on the taxpayer's financial resources at a time when the taxpayer was alleging a need to accumulate earnings for additional working capital and plant improvements. Finally, in our view the fact that a majority stock interest was redeemed made it unlikely that the redemptions were motivated by anything other than a desire on the part of the redeeming shareholders to liquidate their *508 interest at capital gain rates. Thus, we concluded that the redemption served no reasonable business purpose, but instead provided proof of the existence of the proscribed purpose. We think the rationale of Pelton Steel applies with even greater force in the present case. Here nearly 95 percent of the outstanding stock of the Corporation, all of it belonging to a single shareholder, was redeemed in a transaction which consumed most of the Corporation's current and accumulated earnings and profits. The redemption proceeds were reported by Victor as long-term capital gain on his 1976 Federal income tax return. This personal tax benefit, coupled with Victor's undisputed control over corporate affairs before the redemption, raises, at the very least, a presumption that his personal objectives outweighed any alleged corporate purpose for the redemption. The circumstances under which the redemption plan was conceived also suggest that personal considerations predominated in Victor's decision to leave the company. Victor was clearly worried about the future of the company in light of the loss of two major accounts, which collectively had accounted for 44 percent of the Corporation's gross *509 revenues for the taxable year ended September 30, 1974. When asked at trial whether he considered simply retiring and assuming the role of a passive stockholder, he stated that it would have been unwise "to retain stock in a company if you know that their business is slipping." Petitioner's reply brief also states that "[Victor] had no confidence that the company would have had the continuing capacity to pay the dividends to give him a modicum of retirement security." Although we accept Victor's testimony that he left the business with great reluctance and would have preferred to continue on as an owner-employee, even though he was 72 years old, we nevertheless think his departure was spurred principally by a belief that the redemption and sale to Jay was the best financial avenue open to him.Considering that the company was, in Victor's words, "going down the drain," the deal with Jay presented a lucrative opportunity: in exchange for his stock Victor received from the Corporation cash and other assets worth $ 297,618.40, only $ 17,690 of which represented a return of capital ($ 10 par X 1,769 shares), and from Jay he received a $ 60,000 premium for the sale of his remaining share *510 of stock. More importantly, all of the consideration he received was taxable as long-term capital gain. The income tax savings to Victor as a consequence of reporting the $ 283,271.91 cash payment from the Corporation alone as a capital gain distribution versus an ordinary income dividend amounted to $ 63,059.18. [20] Thus, it appears to us that Victor, being aware of the Corporation's cash-rich position and believing that the economic tide had turned against the company, simply decided that the time was ripe to divest his ownership interest. Petitioner concedes that, to a certain extent, Victor's decision to leave the company was in fact motivated by personal considerations. But at the same time petitioner contends that the redemption served a vital corporate purpose because the only other alternative was liquidation. Granted, it is entirely possible that this was the only other option Victor was willing to consider under the circumstances, and, *511 indeed, we have found as a fact that at one point he considered and rejected this alternative. Nevertheless, this does not necessarily call for the conclusion that the distribution in redemption was essential from the standpoint of the Corporation. We note that petitioner has offered no rebuttal to respondent's contention that a dividend could have been declared during the year without frustrating the planned redemption. We found this to be a telling argument in Pelton Steel, and it is even more persuasive on these facts. Since Victor owned nearly 95 percent of the outstanding stock of the Corporation immediately preceding the redemption, the benefit of any dividend distribution declared on the common shares would have inured almost entirely to him, with the holdover shareholder (Jay) deriving only a minor benefit. Likewise, the additional cash drain on the Corporation (relative to that caused by the redemption) would have been negligible. Furthermore, the distribution of earnings via a dividend would have reduced the book value of the Corporation and facilitated the forthcoming transfer of ownership to Jay in much the same manner as did the redemption. Thus, we are not convinced *512 that the wholesale bail-out of earnings and profits which accompanied the redemption was an unavoidable result of the desired shift in ownership. Moreover, our doubts as to the validity of the alleged corporate purpose are compounded by the seemingly inconsistent positions which petitioner has taken during this litigation. The bulk of petitioner's argument on brief was aimed at establishing that the Corporation was near the brink of economic collapse during the taxable year in issue. Victor himself testified at trial that he thought the business was "going down the drain". The minutes of the board of directors' special meeting held on May 1, 1975 state that the loss of the Prudential-Grace line made it "necessary to preserve [the] cash balance for the survival of the company". Accordingly, petitioner has contended throughout these proceedings that its sole purpose in accumulating earnings prior to the redemption was to cushion the company against the shock of business reversals. Yet, despite the grim financial outlook portrayed by petitioner, the Corporation ultimately distributed virtually all of its liquid assets during the taxable year in the redemption of Victor Lamark's stock. *513 As a result, the company found itself bereft of working capital and was forced to borrow $ 20,000 from the Pittsburgh National Bank to meet operating expenses immediately following the distribution. On brief petitioner conceded the effect of the redemption on its financial position, stating that "assuredly, it left the company staggering". Under these circumstances we find it paradoxical, to say the least, that on the one hand petitioner alleges a dire need to conserve working capital, while on the other hand contends that a redemption which stripped the company of its entire cash reserve somehow satisfied a reasonable business purpose. Cf. Pelton Steel Casting Co. v. Commissioner, 28 T.C. at 175. It is not our intention to suggest that the redemption of the stock of a majority shareholder can never be beneficial to a corporation. With regard to the present case, we are not prepared to say that the shift in ownership and control to Jay could not, in the long run, have a positive impact on the Corporation. By relieving the company of the salaries which Victor and Albert had been drawing, and by allowing Jay to exercise his unfettered judgment in the management of corporate affairs, *514 the shift in ownership could conceivably have lifted the Corporation out of its alleged financial difficulties. The fact remains, however, that where a majority interest is redeemed in a capital gain distribution the personal shareholder benefit inevitably permeates the entire transaction, and absent evidence of a bona fide and predominant corporate purpose, the distribution cannot qualify as a business need for purposes of the accumulated earnings tax. [21] In this case petitioner has failed to rebut the unfavorable inferences which may be drawn from the evidence before us.
Accordingly, we find that respondent has met his burden of proof on this issue and hold that the redemption of Victor Lamark's stock did not serve a reasonable business need. Because the assets distributed in that redemption exceeded the Corporation's current earnings and profits, we conclude that all of the latter were accumulated beyond the reasonable needs of the business, thereby creating a presumption of a tax avoidance motive under section 533(a).That presumption stands unless *515 petitioner proves otherwise by a preponderance of the evidence. On this ultimate issue we find petitioner has failed to meet its burden of proof. Although throughout these proceedings Victor and Jay have vehemently denied that the Corporation ever accumulated earnings with the proscribed purpose, their testimony is unpersuasive. We reiterate the Supreme Court's view in United States v. Donruss Co., 393 U.S. 297 (1969), that tax avoidance considerations need only contribute to the decision to accumulate to justify imposition of the tax. We refuse to believe that the redemption of Victor's stock was made in blissful ignorance of the favorable tax consequences which ensued. We also note that under the redemption agreement Victor would appear to be liable for at least a portion of any accumulated earnings taxes assessed for the taxable year in issue, and therefore he can hardly be called a disinterested party in this affair. Moreover, we note that from the date of its incorporation in 1966 until the end of the taxable year in issue the Corporation has paid only one dividend. That dividend totaled $ 8,000 and was paid during the taxable year ended September 30, 1974. A poor dividend *516 history is a key factor to consider in evaluating a corporation's motives during a particular taxable year. Bremerton Sun Publishing Co. v. Commissioner, 44 T.C. 566, 588 (1965); section 1.533-1(a)(2)(iii), Income Tax Regs. The failure to pay dividends in this case allowed Victor and the other redeeming shareholders to drain the Corporation of $ 288,478.40 in retained earnings, reducing its once-substantial cash hoard to almost nothing, while suffering only a capital gains tax in the process. Under these circumstances we find that the testimony elicited at trial is insufficient to overcome the presumption of tax avoidance created by section 533(a). Accordingly, we hold that petitioner was availed of during the taxable year for the purpose of avoiding income taxes with respect to its shareholders by permitting earnings to accumulate instead of distributing them in the form of taxable dividends.Since petitioner has failed to prove that it was necessary to accumulate current year's earnings to meet its reasonable business needs, no accumulated earnings credit will be allowed to offset its accumulated taxable income. To reflect the foregoing, Decision will be entered for the respondent. *517 Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated.↩
2. Petitioner's credit lag between billings and collections of commissions often ran as much as two or three months, depending on the particular shipping line involved. In the case of the Prudential-Grace line the credit lag was much longer, with collections running behind billings anywhere from six to nine months.↩
3. These schedules have been condensed from more detailed schedules prepared by respondent based on his examination of petitioner's books and records. Since petitioner has not objected to any of respondent's figures we have accepted them as true and accurate representations of petitioner's financial activity for the years presented.
*. Schedule reflects cash-basis income and does not include earned commissions not yet received as of year-end.↩
*. Schedule reflects cash-basis expenses with the exception of Federal and state income and payroll taxes, which are accrued.
*. The balance sheet information respondent introduced at trial actually showed a $ 60,000 loan receivable from Jay Lamark. Against this we have offset a $ 3,500 loan payable to Jay Lamark which was included in petitioner's liabilities. Thus, the net amount owed by Jay to the Corporation was $ 56,500.
4. The amount of these payments was stipulated to by the parties. However, the balance sheet information submitted by respondent indicates that the principal payments were actually $ 32,911.65 as of year-end. There is no explanation in the record for the variance.↩
5. The accumulated taxable income on which this tax was determined was calculated as follows: 1976 taxable income
$ 187,279.35 Less: 1976 Federal
income taxes
(76,082.18)
Accumulated taxable income
$ 111,197.17 Petitioner was not entitled to any portion of the minimum accumulated earnings credit under section 535(c)(2) since its accumulated earnings and profits at the close of the prior year exceeded $ 150,000.↩
6. The taxpayer is also entitled to a minimum $ 150,000 credit against accumulated taxable income under section 535(c)(2) regardless of its business needs. This amount, however, is subject to reduction by the amount of any accumulated earnings and profits on hand at the beginning of the taxable year.↩
7. See also note 6, supra↩.
8. Section 534 provides, in part, as follows: (a) General Rule.--In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall-- (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. (b) Notification by Secretary.--Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. (c) Statement by Taxpayer↩.--Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.
9. Sec. 312. EFFECT ON EARNINGS AND PROFITS. (a) General Rule.--Except as otherwise provided in this section, on the distribution of property by a corporation with respect to its stock, the earnings and profits of the corporation (to the extent thereof) shall be decreased by the sum of-- (1) the amount of money, (2) the principal amount of the obligations of such corporation, and (3) the adjusted basis of the other property, so distributed. ↩
10. Sec. 312. EFFECT ON EARNINGS AND PROFITS. (e) Special Rule for Partial Liquidations and Certain Redemptions↩.--In the case of amounts distributed in partial liquidation (whether before, on, or after June 22, 1954) or in a redemption to which section 302(a) or 303 applies, the part of such distribution which is properly chargeable to capital account shall not be treated as a distribution of earnings and profits. 11. Sec. 316. DIVIDEND DEFINED. (a) General Rule.--For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders-- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. * * * 12. This figure was arrived at by dividing the total contributed capital prior to the 1975 and 1976 redemptions ($ 20,000) by the total shares outstanding (2,000). ↩
13. The proper charge to the capital account is generally held to be the pro rata portion of the contributed capital which is allocable to the redeemed shares, and this holds true even if the amount distributed in the redemption exceeds the book value of the shares because of unrealized appreciation in assets or goodwill which may be reflected in the redemption price. Anderson v. Commissioner, 67 T.C. 522 (1976), affd. per curiam 583 F.2d 953 (7th Cir. 1978); Enoch v. Commissioner, 57 T.C. 781 (1972); Helvering v. Jarvis, 123 F.2d 742 (4th Cir. 1941); see also Rev. Rul. 79-376, 1979-2 C.B. 133↩. 14. We assume, since the parties have produced no evidence to the contrary, that petitioner's current earnings and profits for the year in issue were equal to its accumulated taxable income as computed in respondent's notice of deficiency. See note 5, supra↩.
15. The resolution of this issue depends on how one interprets the relationship between several different Code provisions. Section 532(a) provides that the accumulated earnings tax applies to any corporation formed or availed of for the purpose of avoiding income taxes with respect to its shareholders "by permitting earnings and profits to accumulate instead of being divided or distributed." (Emphasis added). Once this statutory requirement is satisfied, section 531 imposes the penalty on the corporation's accumulated taxable income as computed under section 535. Accumulated taxable income is essentially a measure of the corporation's current earnings and profits and is generally equal to taxable income after certain adjustments, less the dividends paid deduction and the accumulated earnings credit. The dividends paid deduction is defined in sections 561 through 565. The key provision insofar as the present issue is concerned is section 562(c), which provides that no distribution shall be eligible for the dividends paid deduction unless the distribution is pro rata. Under this rule a non-pro rata stock redemption does not qualify for the dividends paid deduction, and consequently does not reduce accumulated taxable income (assuming, of course, that the redemption does not otherwise qualify as a reasonable business need eligible for the accumulated earnings credit provided under section 535(c)). However, sections 312(a) and 316(a) provide that amounts paid in connection with a redemption of stock are treated as distributions out of current earnings and profits to the extent they are not properly chargeable to the capital account under section 312(e). Thus, under the statutory framework it is possible to have a stock redemption which consumes all of the current year's earnings and profits without effecting a corresponding reduction in the corporation's accumulated taxable income. Since section 532(a) arguably requires an accumulation of earnings and profits during the taxable year, the imposition of the accumulated earnings tax under these circumstances is subject to serious question. In GPD, Inc. v. Commissioner, 60 T.C. 480 (1973), we relied on several of our prior decisions and held that the accumulated earnings tax could not be applied in a year in which, because of stock redemptions, no current earnings and profits were retained by the corporation. The Sixth Circuit, 508 F.2d 1076 (1974), relying in part on the opinion of the District Court in Ostendorf-Morris Co. v. United States, an unreported case ( N.D. Ohio 1968, 26 AFTR 2d 70-5369, 70-2 USTC par. 9550), as well as on a lengthy analysis of the legislative history of the accumulated earnings tax provisions, concluded that the accumulated earnings tax could still be imposed under these circumstances if the requisite tax avoidance motive were found to be present. Somewhat surprisingly, there have been no other reported cases dealing with this issue since the Sixth Circuit handed down its reversal in GPD. For an analysis of the GPD cases see Rudolph, "Stock Redemptions and the Accumulated Earnings Tax-An Update," 4 J. Corp. Tax. 101 (1977); Comment, "GPD, Inc. v. Commissioner: Closing a Loophole in the Accumulated Earnings Tax," 70 Nw.U.L. Rev. 651↩ (1975).
16. Neither party has requested findings of fact concerning petitioner's net liquid assets at the end of the year in issue. Because of the holding we reach in this case it is technically unnecessary for us to make a specific finding on this matter. For the sake of completeness, however, we have computed petitioner's net liquid assets as follows: Liquid assets as of
September 30, 1976
Cash
$ 19,529.76 Miscellaneous receivables
262.94 Loan receivable-Jay Lamark
9,411.65 Taxes payable
(972.94)
$ 28,231.41 Loans to shareholders are generally included in liquid assets on the ground that a contrary rule would permit a corporation with excessive accumulations to lessen its exposure to the penalty by temporarily diverting liquid assets to its shareholders. See Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 328-330 (1968); Nemours Corp. v. Commissioner, 38 T.C. 585, 602-604 (1962), affd. per curiam 325 F.2d 559 (3rd Cir. 1963); Whitney Chain & Manufacturing Co. v. Commissioner, 3 T.C. 1109 (1944), affd. per curiam 149 F.2d 936 (2d Cir. 1945). In the instant case, however, most of the funds loaned to Jay Lamark were borrowed by the Corporation from the Pittsburgh National Bank; in other words, the Corporation acted merely as a conduit in arranging a personal bank loan for Jay Lamark to finance his purchase of Victor Lamark's remaining share of stock.Thus, we think the loan receivable from Jay Lamark ($ 56,500) should be included in liquid assets only to the extent it exceeds the balance owed on the Pittsburgh National note ($ 47,088.35). One other point deserves mention. Petitioner is a cash method taxpayer and therefore the financial schedules do not disclose any unbooked accounts receivable or accounts payable at year-end. Arguably these amounts (net of estimated income taxes) should be included in the computation of net liquid assets in order to arrive at a true measure of petitioner's liquidity, even though such amounts are not reflected in the Corporation's accumulated taxable income. We will not address this issue because there is insufficient evidence in the record to allow a determination of petitioner's accrual-based liquid position at year-end. ↩
17. While we think this treatment is proper in the year in which the redemption takes place, it is doubtful that the assets distributed should affect the computation of net liquid assets in subsequent years, since the funds distributed are irretrievably lost to the Corporation.↩
18. We note that petitioner has made no argument that the redemption of the minority stock interests satisfied a reasonable business purpose.↩
19. See Pelton Steel Casting Co. v. Commissioner, 28 T.C. 153, 174 (1957), affd. 251 F.2d 278 (7th Cir. 1958), cert. denied 356 U.S. 958↩ (1958); see also Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.07, p. 8-29 (4th ed.). We note, however, that Congress has seen fit to provide an exception for redemptions of stock which qualify under section 303. Section 537(a)(2) provides that earnings necessary to fund such redemptions will be deemed to have been accumulated for reasonable business needs, but only for the taxable year of the corporation in which the shareholder died or for any taxable year thereafter. See section 537(b)(1) and (4).
20. Respondent calculated this figure based on the information contained in Victor's 1976 Federal income tax return, and petitioner has made no objection concerning its accuracy. Therefore, we have included it as a finding of fact herein.↩
21. For a good discussion of these issues see Herwitz, "Stock Redemptions and the Accumulated Earnings Tax," 74 Harv. L. Rev. 866↩ (1961).